The ISLAND TERRITORY OF
CURACAO, Petitioner,

v.

SOLITRON DEVICES, INC., Respondent.

No. 72 Civ. 625.

United States District Court,
S. D. New York.

Feb. 14, 1973.

1

Weil, Gotshal & Manges, New York City, for petitioner; Edward C. Wallace, Marshall C. Berger, New York City, of counsel.

Windels, Merritt & Ingraham, New York City, for respondent; Paul Windels, Jr., Francis E. Koch, New York City, of counsel.

WYATT, District Judge.

This is a motion by petitioner The Island Territory of Curacao (Curacao) for an order confirming an arbitration award and enforcing a judgment.

Curacao is a political entity which is part of the Netherlands Antilles, which in turn is a separate political entity and a part of the Kingdom of the Netherlands.

Respondent Solitron Devices, Inc. (Solitron) is a New York corporation with its principal place of business in Rockland County in this District. Solitron makes and sells semiconductor devices for the electronics industry.

The award was made by three arbitrators at Willemstad in Curacao on August 13, 1970. Solitron did not participate in the arbitration. The award was in favor of Curacao and, among other things, directed Solitron to pay to Curacao some 445,000 guilders (the local currency; something over $250,000), with interest and costs. The award was "deposited" at the Registry of the Court of First Instance in Curacao and on August 14, 1970 a Judge of that Court issued a "writ of execution" which declared that the award was "enforceable".

On February 10, 1972, Curacao filed in this Court a petition "to confirm arbitration award and to enforce the judgment entered thereon". Curacao then caused service to be made on Solitron of the summons and petition and also of notice of the present motion (the exhibits described in the petition are in fact annexed to the motion papers).

The petition invokes the "Convention on the Recognition and Enforcement of Foreign Arbitral Awards", the enforcement of which is provided for in Chapter 2 (§§ 201–208) of Title 9 of the Code. Jurisdiction seems clearly conferred by 9 U.S.C. § 203; diversity jurisdiction is also asserted. There is a "related claim" based on New York law, specifically, CPLR Article 53 (§§ 5301–5309), "Recognition of Foreign Country Money Judgments".

Solitron filed an answer asserting many defenses and with a counterclaim for money damages.

The matter was pending before Judge McLean at the time of his death, was thereafter reassigned to me, and duly came on to be heard.

1.

A written agreement was executed in triplicate in Curacao on January 12,

1968. Solitron and Curacao were parties; the Netherlands Antilles, the government entity for all the Dutch islands in that area and referred to in the agreement as the "Central Government", was also a party. (The geographical area and the government entity of Netherlands Antilles will sometimes be referred to simply as the "Antilles".) The agreement was apparently in Dutch. A translation is part of the moving papers; Solitron has submitted nothing to cast doubt on the accuracy of this translation; a certain awkwardness is noticed as to a few of the words in translation.

The aims of the parties are evident. The principal competitors of Solitron had been manufacturing their devices "offshore", outside the United States, "in places where labor is available . . . at far less than prevailing wage rates in the United States." (Friedman opposing affidavit, p. 1) There was "heavy price competition" in the industry, "pressures on Solitron mounted" (Friedman, pp. 1, 2), and Solitron believed a plant in Curacao would give it the needed advantages. On their part, Curacao and Antilles wanted to attract industry to the islands and thus to create jobs. There were no representations in the agreement, however, as to wage rates—past, present, or future—or as to anything else.

Curacao had initiated the contact with Solitron, whose President "expressed interest in locating a manufacturing facility in Curacao" (Friedman, p. 2). The negotiations for the agreement then took place in Curacao. Solitron's president was in Curacao in August 1967 where he met "all of the top governmental and judicial officials of the island" and "many of its business leaders and bankers" (Friedman, p. 2). He was there again before and at the signing of the agreement and undoubtedly Solitron had counsel in Curacao for all needed advice.

The agreement goes into some detail but for present purposes only the principal provisions which affected the award need be outlined.

Curacao set aside ("destines" is the word used in the translation) for an industrial park about 60 acres near the airport (Art. 1).

Curacao agreed to construct two factory buildings in the park, one ("the larger") of about 30,000 square feet and the other ("the smaller") of about 20,000 square feet. These are to be built according to plans submitted by Solitron and approved by Curacao. Presumably the buildings were to be erected at the expense of Curacao, but there is a statement that when the plans are approved, "a written agreement shall be concluded" between the parties specifying what costs were to be for Curacao and what for Solitron. (Art. 9) Presumably such an agreement was made because, as will later appear, Curacao did in fact bear many expenses and Solitron did in fact send in a substantial amount of material for the buildings.

Curacao agreed to build an access road to the park and other roads within the park up to the building sites (Art. 8). Curacao agreed at its expense to lay pipes to supply the park with distilled sea water (Art. 5).

The two buildings were required to be "delivered" within 12 months of approval of the plans and to be leased "forthwith" to Solitron for 20 years at a rent, the amount of which was specified (Art. 9). It was agreed that Solitron would operate in the larger building and could use the smaller building also or could sublease it.

Solitron agreed "to put its electronic manufacturing industry into operation" within 12 months of delivery of the larger building and "shall create" at least 100 jobs (presumably within the 12 month period). (Art. 3)

Solitron agreed that before January 1, 1974 it would establish (presumably in the park) "manufacturing industries" which, with Solitron's own employment, would "provide employment for at least three thousand (3000) persons born in the Netherlands Antilles . . .". (Art. 3)

It was provided that "the laws of the Netherlands Antilles shall be applicable" (Art. 12).

There were detailed provisions in Article 12 for arbitration of any dispute between the parties. Since these provisions are of significance to the present motion, it may be well to quote them in full:

"2a. All disputes arising between the CENTRAL GOVERNMENT and/or the ISLAND GOVERNMENT, and SOLITRON as a consequence of or in connection with the present agreement or further agreements for the implementation of the present agreement, legal as well as factual, shall be submitted to a board of arbitration. The decision of this board shall be binding on all parties involved in the dispute.

"b. A dispute shall be considered to exist if one of the parties notifies the other party by registered letter that he is of opinion that such is the case. In the case of such a dispute each of the parties shall appoint an arbitrator and both arbitrators so designated shall jointly appoint a third one. Should one of the parties or both parties not designate an arbitrator within one month or should both arbitrators not reach an agreement on the choice of the third arbitrator, then the third arbitrator shall at the request of the willing party be appointed by the President of the Court of Justice of the Netherlands Antilles.

"c. The arbitrators shall have to render an award within four months after the day on which the third arbitrator has accepted his appointment.

"d. The arbitrators shall judge and give an award like good men and true, taking into account that which has been stipulated by contract between parties without being bound by rigid rules of the laws of the Netherlands Antilles. The procedure with respect to the settlement of the dispute shall be determined by the arbitrators.

"e. The fee due to the arbitrators shall be borne by the CENTRAL GOVERNMENT and/or the ISLAND GOVERNMENT, and SOLITRON, on a fifty/fifty basis. All other costs arising from the arbitration shall be chargeable to the party found to be in error. The arbitrators are entitled to set off these costs against each other wholly or partially, should both parties be found to be partially in error."

Finally, there was a provision which reads as follows:

"*Article 13*

SOLITRON shall invariably choose domicile for everything pertaining to the execution of the present agreement and further agreements made for the implementation or supplementation of the present agreement, as well as for all acts of judicial execution at the office of notary-public Mr. E. L. Joubert, Kerkstraat 11A, Wilemstad, Curacao."

The word "invariably" seems to be a poor translation. According to counsel for Curacao, the Dutch word "onveranderlijk"; this same word is also used in the award (Exhibit I, p. 1) and is there translated "irrevocably" (Exhibit J, p. 1). The meaning conveyed, even by "invariably", is that Solitron submits itself to the jurisdiction of Curacao and designates, without power of change, a resident of Curacao as its agent on whom notice or process can be served.

It seems that the local resident agent of Solitron, Notary Public Joubert, was in fact the attorney in Curacao for Solitron.

2.

From the papers submitted (other than the arbitration award), it is not clear what happened between the execution of the agreement on January 12, 1968, and the initiation of arbitration by Curacao on April 13, 1970. For purposes of the present motion, this is of no moment. Some things do appear from the papers without any serious dispute

and, at least for background, it may be well to mention them.

Solitron did submit plans for the two buildings and the plans were approved.

Solitron shipped to Curacao structural steel, air conditioning and other equipment, and work tables; this was for the two buildings and Solitron says it was "worth" $221,855 (this is the subject of Solitron's counterclaim).

The two buildings were completed and, except for the material shipped in by Solitron, was at the expense of Curacao. When the buildings were completed, does not appear; on April 13, 1970, the Lieutenant Governor stated flatly: " . . . we completed the two factory buildings at an expense to us of NAf. [local currency] 1,500,000".

In May 1969 and for a time thereafter, widespread disorders occurred in Curacao, probably caused by unemployment, low wages, and social unrest. Government did not break down, but there was some change in government personnel and policies. As one of the new policies, there was a new minimum wage law which, according to Solitron, "immediately raised minimum wages by two and one-half times" (Friedman, p. 4).

The new minimum wage law caused Solitron to lose interest in Curacao and in the agreement; it determined that it would not carry out the agreement. As counsel for Solitron later and frankly put it: "The new wage rate destroys the economic advantage of manufacturing in Curacao".

The president of Solitron was in Curacao in November 1969, apparently attempting to get out of the agreement.

A lease on the two completed buildings was offered to Solitron in accordance with the January 12, 1968 agreement. Solitron refused the lease. This seems to be established by the papers and in any event to be evident. The position of Solitron in its pleading is in this respect puzzling.

The petition of Curacao alleges:

"8. Thereafter, the two factory buildings required to be constructed by the Agreement were in fact built by Curacao. Despite this, Solitron refused to enter into a lease agreement and perform other obligations imposed upon it by the Agreement."

The answer of Solitron does not mention this paragraph 8 and does not specifically admit or deny its averments. Apparently Solitron intends to cover paragraph 8 of the petition by a general denial in paragraph 1 of its answer. It is difficult to see how Solitron can deny that it refused to enter into a lease, whatever its excuses may be. Refusal to enter into a lease was and is the critical issue in the dispute. It is also difficult to see how Solitron can deny that the buildings were completed; Solitron does not say that it is without knowledge or information sufficient to form a belief as to the truth of the averment that the buildings were completed; it denies outright that the buildings were completed. Yet later in the answer Solitron avers (para. 31) that Curacao "has leased to third persons the premises which it agreed to lease to Solitron".

3.

On April 13, 1970, Curacao sent to Solitron in care of its agent in Curacao a written notice of dispute and of the invocation of arbitration. Curacao appointed as its arbitrator Dr. de Haseth. It does not appear what is the business or profession of Dr. de Haseth.

Evidently Solitron received the notice. On May 12 and May 13, 1970, Solitron sent cables to its resident agent in Curacao, named in the agreement, which agent was also its attorney there. The cables purported to revoke the authority of the agent "to represent us" (annex to Friedman affidavit). The agreement, however, does not permit any such revocation. Under date of May 15, 1970, New York counsel to Solitron wrote to

Curacao declining to proceed to arbitration.

When Solitron failed to designate an arbitrator within the time provided in the agreement, Curacao asked the President of the Court of Justice of Antilles to make the appointment. The President on June 9, 1970 appointed Dr. Schoordijk, who is a professor (of what does not appear) at the University of Tilburg, a city in the southern part of the Netherlands. Notice of this was given to New York counsel for Solitron.

The two arbitrators then appointed a third arbitrator, Dr. Ariens. At the time, Dr. Ariens was a "substitute member" (probably similar to a "senior judge" in the federal courts) of the Court of Justice of the Antilles and had formerly been President of that Court.

By cable on July 1, 1970, Dr. de Haseth advised Solitron at its principal place of business in Rockland County of a schedule for submission of statements by the parties (in English, if desired) and of a hearing to be held on Monday, August 11, 1970 (evidently this was a typographical error; August 11, 1970 was a Tuesday). Under date of July 9, 1970, Dr. de Haseth confirmed this by letter to Solitron in Rockland County and also advised of the appointment of the second and third arbitrators and of their professional backgrounds.

By letter dated July 23, 1970, Dr. de Haseth advised Solitron of the appointment of Dr. Ariens as Chairman and of the appointment of a Secretary.

By letter under date of August 3, 1970 to Solitron in care of its agent in Curacao, the Secretary advised that the hearing would be on August 10, 1970 at 0900 in the Chamber of Commerce Building in Curacao and summoned Solitron to appear then and there. A similar advice was sent by letter dated August 4, 1970 to Solitron in Rockland County.

4a.

The arbitrators met on August 10, 1970 and conducted a hearing, Curacao being there represented. Documentary evidence was received. On the same day, the arbitrators visited the industrial park wherein the factory buildings were located "to take stock of the configuration of the terrain" (Award, p. 5; references to the award are to the English translation, physically a part of the motion papers but described in the petition and recited to have been annexed thereto). The arbitrators heard witnesses on August 11 and 12, 1970 and drew up a report of their testimony.

Solitron ignored the arbitration completely; it did not attend any hearing and submitted nothing to the arbitrators, in writing or otherwise.

The award was made and signed by the arbitrators in Curacao on August 13, 1970. The award is said to be made "ex aequo et bono". This expression probably has no bearing on the present motion but its meaning can be determined.

A translation of relevant parts of the arbitration law of the Antilles is part of the moving papers. That law is sometimes referred to herein as simply "the law", where the context points of the law of the Antilles.

The law provides that a "reward" (evidently a typographical error for "award") is to be made "according to the law, unless the compromise has granted them the power to judge as good men in accordance with the principles of equity". It is assumed that "compromise" is a poor translation for "agreement".

It would appear that the provision in the January 12, 1968 agreement that the arbitrators shall "give an award as good men and true" was intended to authorize them "to judge as good men in accordance with the principles of equity".

The use by the arbitrators of the expression "ex aequo et bono" is believed to indicate that the arbitrators acted under the authority just described. "Ex aequo et bono" comes from the civil law and means, among other things, "according to equity and conscience" (Black's Law Dictionary (4th ed.) 659). Indeed,

the word "equity" comes from the Latin "aequus" ("equal").

### 4b.

The award was in favor of Curacao, but the arbitrators did not accept all the points of Curacao, rejecting important items of damages.

The arbitrators found that the date of completion of the buildings was December 1, 1969 (p. 15); references are to pages of the English translation in the moving papers); that in negotiations thereafter between the parties about the lease Solitron never objected to December 1, 1969 as the date when the lease should begin (p. 12); that an offer of lease of the two buildings had been made to and refused by Solitron (pp. 5–7); and that this was a breach of contract for which Solitron was obliged "to pay compensation" (p. 7).

While Solitron boycotted the arbitration proceeding, the arbitrators nevertheless considered the two defenses asserted by Solitron in a letter of March 18, 1970 to Curacao by Solitron's attorney there and in the letter (already mentioned) of May 15, 1970 of Solitron's New York counsel to Curacao.

The two defenses were:

(i) that the "basic factors and information" on which Solitron decided to operate in Curacao having "disappeared" because of the May disorders and the new "general minimum wage law", Solitron by "force majeure" was "discharged" from the January 12, 1968, contract (p. 6); and

(ii) that Solitron made the contract by mistake induced by assurances of Curacao that the wages then obtaining would continue whereas there was quickly a new and increased minimum wage law (p. 8).

The arbitrators noted that the new minimum wage law did not apply to a private enterprise such as Solitron but only to employees of the government in Curacao; and that as to the May 1969 disorders these were "an isolated incident" (pp. 10, 11) and not a standard by which to judge the 20 year contract period (p. 11).

As to (i), the arbitrators found that in agreeing to a 20 year lease Solitron could not have expected wages in Curacao to remain the same over the 20 year period as they were on January 12, 1968; that under the contract law of the Antilles force majeure refers to an external cause not foreseeable at the time of the contract; and that wage changes over the 20 year period, foreseeable by Solitron, could never be force majeure (pp. 7–8).

As to (ii), the arbitrators found that whether there had been any assurances to Solitron involved a dispute suitable for arbitration; and that on the evidence there had been no such assurances. Further, the arbitrators found that, for a successful defense of mistake under the contract law of the Antilles, the party pleading mistake (Solitron) must have reasonably believed in the existence of the matter as to which it was mistaken and moreover that such mistaken belief was known to the other party (Curacao). The arbitrators found that neither condition was satisfied in the dispute before them.

The arbitrators accordingly found that the position of Solitron, expressed before but not in the arbitration, was without merit.

The arbitrators then turned to the question of damages.

With one exception, the arbitrators rejected all claims of Curacao for damages for "investment costs" (p. 4), such as erection of the buildings, laying out of roads, etc. These items were rejected because it was said that even if Solitron had performed its obligations, these "investment costs" would have been incurred (p. 11). The one exception was the cost of an acid neutralization plant which was found to have been intended uniquely for Solitron and in which no other lessee would be likely to have an interest. The amount allowed for this (p. 12) was 53,602.53 "NAfls." (the lo-

cal currency, Netherlands Antilles guilders; the currency figures hereafter shown without a dollar sign are in local currency). The total amount of "investment costs" claimed by Curacao was 1,521,000.25 (p. 4); the amount not allowed by the arbitrators was thus 1,467,397.72.

The arbitrators allowed 192,482.62 for loss of rent on the two buildings for the period December 1, 1969 to July 1, 1971 (pp. 12, 13). It was found "virtually certain" that Curacao could not find another lessee before July 1, 1971 at the earliest.

For the same period, the arbitrators allowed 1,021.25 as damages on account of fire insurance premiums which Curacao had paid and would pay. Under the January 12, 1968 contract, Solitron agreed at its own expense to insure the buildings against fire (Article 9(6)).

The arbitrators allowed 375,000 for the period December 1, 1970 to December 31, 1973 as damages for Solitron's failure to create 100 jobs as agreed (pp. 14, 15). The basis for this allowance was that, by reason of Solitron's breach, Curacao would have 100 more unemployed in the period than otherwise. Under its laws, Curacao would have to pay "unemployment benefits" to these 100 and also "medical assistance" (p. 14). The amounts of such payments were calculated by using 1969 statistics, with percentage increases for later years as "can be expected". The total amount of such payments for the period was calculated to be 423,671.35 which the arbitrators "ex aequo et bono" reduced to 375,000 to reflect the present value discount (p. 15). The beginning of the period (December 1, 1970) was determined as the date when Solitron's breach occurred. The end of the period (December 31, 1973) was determined as the date beyond which the arbitrators would not be justified in awarding this type of damages because the existence of unemployment that far in the future was dependent on unknown factors and "not readily predictable" (p. 16).

The arbitrators did not allow the claim of Curacao for damages for Solitron's failure to create 3,000 jobs by January 1, 1974. This was for the same reason given for ending at December 31, 1973 the award of damages for failure to create the 100 jobs. Damages, if any, for breach of the 3,000 job obligation would be for a period beginning on January 1, 1974 and the existence of unemployment that far in the future was dependent on unknown factors and "not readily predictable" (p. 16).

The arbitrators, as noted, did not—for the reason indicated—award damages for any period after December 31, 1973. It is said in the award, however, that "around January 1, 1974, the more diligent party will be able to submit" certain questions "to arbitration in accordance with the procedure laid down in the Agreement" (p. 16). These questions are: (1) loss of rent after December 31, 1973; (2) fire insurance premiums after that date; (3) damages after that date for failure to create 100 jobs; and (4) damages after that date for failure to create 3000 jobs.

The arbitrators allowed the cost to Curacao of foreign travel to secure the establishment of industries there. This was found necessary because of the failure of Solitron to perform its obligation to establish such industries. The cost was found to be 25,000 per year and this was allowed for three years—1971, 1972, and 1973. After applying a present value discount, the allowance for this item was 69,000. (pp. 16–17)

The arbitrators allowed the cost to Curacao of custodians to guard the two factory buildings. According to "vouchers produced" (p. 17) this cost was 2,100 per month. The period for which this allowance was made began at August 1, 1970 (presumably because this was the first month for which "vouchers" were "produced") and ended at July 1, 1971 (for the same reason as the allowance for lost rent). For the 11 month period, the total was thus 23,100. After applying a present value discount,

the allowance for this item was 21,000. (p. 17)

The arbitrators rejected a claim for the costs of prosecuting the arbitration (pp. 16, 17).

To recapitulate the award to this point, the following items were allowed:

| | |
|---|---:|
| for the acid neutralization plant | 53,602.53 |
| for loss of rent to July 1, 1971 | 192,482.62 |
| for fire insurance premiums to July 1, 1971 | 1,021.25 |
| for failure to create 100 jobs | 375,000.00 |
| for failure to establish industries (foreign travel) (to December 31, 1973) | 69,000.00 |
| for guarding the buildings (to July 1, 1971) | 21,000.00 |
| | 712,106.40 |

The arbitrators then allowed Solitron a set off for the value of the structural steel and air conditioning plant (but not "chairs and tables"). This value was found to be 266,424.05. (pp. 18, 19)

The net allowance to Curacao was thus 445,682.35.

The arbitrators awarded interest at the rate of 6% (p. 20); it was stated that interest would run from July 10, 1970, the date when the proceedings commenced.

In addition, under Article 12(e) the arbitrators awarded to Curacao against Solitron $7,500 as one-half the fees of the arbitrators and $1,665 as the total of the expenses incurred by the arbitrators, already paid by Curacao.

The award to Curacao was therefore 445,682.35 Netherlands Antilles guilders and $9,165.

The award gives every indication of able, careful, and impartial work by the arbitrators.

### 4c.

After the award had been made, the procedure followed was that prescribed by the law of the Antilles.

The law requires that the original award must be filed in the Court of First Instance. This was done on August 13, 1970.

The law provides that an award "may be executed by the usual procedure of execution in virtue of an order of the Court of First Instance." Under this provision, Curacao asked for issuance of a writ of execution and on August 14, 1970 the Court of First Instance declared the award to be enforceable and issued a writ of execution.

An award may not be "opposed" nor may it be appealed (unless the agreement so provides and that in suit did not so provide).

There is provision in the law for an action to annul the award on grounds which include in general those specified in 9 U.S.C. § 10. Such an action must be brought within three months from the filing of the award in Court. Solitron brought no such action. The award and the judgment entered thereon are final.

In April 1971, a "marshal" of the "Court of Justice of the Netherlands Antilles" served by mail to Solitron in Rockland County a writ based on the award and judgment in Curacao. This writ recited that Solitron "is no longer domiciled in the Netherlands Antilles". (Whether the "Court of Justice of the Netherlands Antilles" is the same as the "Court of First Instance", does not appear.)

### 5.

■ Solitron objects that there was "no jurisdiction" over it in Curacao. The objection is so without merit as to be frivolous.

Under the January 12, 1968 agreement, Solitron specifically agreed to submit to arbitration in Curacao, agreed that the laws of the Antilles should be applicable, and agreed that for "everything" connected with that agreement it had a Curacao "domicile" and a resident agent for service of notice and process.

Under such an agreement, there was jurisdiction in Curacao to regulate the arbitration and to enter judgment on the award. There are controlling federal and New York decisions supporting this conclusion. National Equipment Rental, Ltd. v. Szukhent, 375 U.S. 311, 315–316,

84 S.Ct. 411, 11 L.Ed.2d 354 (1964); Reed & Martin, Inc. v. Westinghouse Electric Corp., 439 F.2d 1268, 1276–1277 (2d Cir. 1971); Gilbert v. Burnstine, 255 N.Y. 348, 174 N.E. 706 (1931); New Central Jute Mills v. City Trade & Industries, Ltd., 65 Misc.2d 653, 318 N.Y.S.2d 980, 984 (Sup.Ct., N.Y.Cty. 1971); CPLR § 5305(a)(3).

There is an argument for Solitron based on the statement in the 1971 writ that Solitron was then "no longer domiciled" in Curacao. Why such a statement was made is indeed mystifying. Doubtless it is based on the revocation messages of May 12 and 13, 1970 from Solitron to its resident agent in Curacao. It may be that for purposes of proceedings to enforce a judgment, for example, by writ of execution, the revocation of authority was effective, on the theory (dubious in my view) that such proceedings were outside the consent in the January 12, 1968 agreement. There is some support for such a theory in Sargant v. Monroe, 268 App.Div. 123, 49 N.Y.S.2d 546 (1st Dept., 1944). For the arbitration, however, and "everything" else pertaining to the agreement, the revocation was ineffective because under the agreement the consent to jurisdiction was irrevocable. Moreover, by the time of the attempted revocation on May 12, 1970, Curacao had already invoked arbitration under the agreement.

### 6.

■ Solitron objects because it says it made the agreement on representations of Curacao that "the wage structure would remain stable" (Memo, p. 5) whereas the minimum wage was quickly increased "by more than 100%" and the agreement was thus "terminated by reason of impossibility" (Memo, p. 5). This objection also has no merit whatever.

It has been determined by highest authority that "claims of fraud in the inducement of the contract generally" are exclusively for the arbitrators. Prima Paint Corp. v. Flood & Conklin Mfg. Co.,

388 U.S. 395, 404, 87 S.Ct. 1801, 1806, 18 L.Ed.2d 1270 (1967).

If fraud in the inductment is for the arbitrators, then even more so is any issue, such as frustration and termination, arising *after* an admitted execution of an agreement. This follows from the reasoning of Prima Paint. It has been held that "whether circumstances have arisen which have discharged one or both parties from further performance" is a question for the arbitrators. Heyman v. Darwins, (1942) A.C. 356, 366, quoted with approval in In re Pahlberg Petition, 131 F.2d 968, 970 (2d Cir. 1942). It has been specifically held that "frustration of performance of the contract" is an issue solely for the arbitrators. Goldhill etc. v. Caribbean Shipping Co., 56 F.Supp. 31 (S.D.N.Y.1944).

### 7.

■ Solitron objects that the award and judgment are "not final, definite, and conclusive". This objection is based on 9 U.S.C. § 10(d) which provides that an award may be vacated if the arbitrators "so imperfectly executed" their powers "that a mutual, final, and definite award . . . was not made".

The strange point made by Solitron is that the arbitrators did not award damages in a larger amount for a longer period, but instead stopped at the period ending December 31, 1973; "they make no attempt to ascertain the total damages occasioned" (Memo, p. 7). Solitron objects that the arbitrators left open the possibility of a further arbitration in the future to fix the amount of damages after January 1, 1974. The argument is that because the damages awarded Curacao are not sufficient to cover the entire contract period, Curacao should receive nothing, not even what Solitron argues are the incomplete and inadequate damages in the present award. Such an argument is not persuasive.

The federal Arbitration Act is the same or almost the same as the arbitration law in New York, now CPLR § 7501 and following. Thus, "the state practice

may be regarded as highly persuasive, even if not controlling". The Hartbridge, 57 F.2d 672, 673 (2d Cir. 1932). Section 10(d) of Title 9 is substantially the same as CPLR 7511(b)(1)(iii).

No federal cases have been found which are helpful in connection with the "final" character of an award.

The attitude of New York courts toward arbitration is that such proceedings "are equitable in character". In re Feuer Transp., Inc., 295 N.Y. 87, 92, 65 N.E.2d 178 (1946).

The kind of award which has been held not "final" is illustrated by Matter of Overseas Distributors Exchange, Inc., 5 A.D.2d 498, 173 N.Y.S.2d 110 (1st Dept. 1958). The award left open "the amount which appellants are obligated to pay". The Court said: "These directions are not only indefinite, but the determination of the amounts depends upon more than just arithmetical calculations. Businessmen and accountants can well disagree as to what a set of books shows as being 'due' to a party. An award must be clear enough to indicate unequivocally what each party is required to do."

Another example is Pyramid, Inc. v. Nat. Telefilm Assoc. Inc., 40 Misc.2d 675, 243 N.Y.S.2d 170 (N.Y.Cty.Sup.Ct. 1963). The award directed an accounting, subject to audit by independent accountants who, if they found the accounting unfair, were directed themselves to prepare an accounting which would be binding. The Court found that the arbitrator had delegated to accountants his power to decide the amount due, and that the award was thus not "final".

In the examples cited, the result was not that the debtor party escaped liability, as Solitron apparently hopes to do, but simply that the matter was resubmitted to the arbitrators to find the amount due.

In the case at bar, the award specifies precisely what Solitron is to pay. Nothing more remains to be calculated at this time. That at some time in the future another arbitration and another award are *possibilities* does not mean that the present award at the present time is not "final" and "definite".

## 8.

■ Solitron objects that one of the arbitrators was a judge of a court in Curacao, was thus in the employ of Curacao, and was "not impartial as a matter of law" (Memo, p. 8). There is nothing to support the objection. For all that appears, the judge was already retired; in a letter to Solitron, he was said to be leaving the Antilles in August or September 1970. For all that appears, his tenure was for life or for a term unaffected by any decision in this matter.

In any event, Solitron was fully advised as to the employment of the arbitrator but remained silent and made no objection to his acting. The point, whatever its worth, was thereby waived. Cook Industries, Inc., v. C. Itoh & Co., Inc., 449 F.2d 106, 107–108 (2d Cir. 1971).

## 9.

■ Solitron objects (Memo, pp. 10, 11) that the award did not arise out of a "legal relationship . . . which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title . . ." (9 U.S.C. § 202) and thus did not fall under the Convention (9 U.S.C. § 202). The reference to Section 2 is to "any maritime transaction or a contract evidencing a transaction involving commerce".

The Convention, which is enforced by Chapter 2 of Title 9 of the Code, was adopted in 1958 by the United Nations Conference on International Commercial Arbitration. It was provided that each "Contracting State" (and both the United States and the Netherlands became such) could declare that it would apply the Convention only to awards arising from "legal relationships . . . which are considered as commercial

. . . ". The United States so declared and 9 U.S.C. § 202 so provides.

Research has developed nothing to show what the purpose of the "commercial" limitation was. We may logically speculate that it was to exclude matrimonial and other domestic relations awards, political awards, and the like.

Judged by any test, however, the contract of January 12, 1968 seems clearly to be "commercial". It has been said in this connection (Quigley, Convention on Foreign Arbitral Awards, 58 A.B.A.J. 821, 823 (1972)): "In the case of the United States reservation it seems clear that the full scope of 'commerce' and 'foreign commerce', as those terms have been broadly interpreted, is available for arbitral agreements and awards."

■ It should also be noted that even if the "legal relationship" were not "commercial" the Curacao judgment would be enforceable under the New York law on recognition of foreign judgments which enforces any foreign judgment which is "final, conclusive and enforceable where rendered" (CPLR § 5302). There is no "commercial" limitation in the New York law.

■ In this connection, Solitron suggests that damages should not have been awarded for what Curacao will have to disburse for unemployment insurance and medical assistance, because these involve a "governmental function". The items are most unusual, it is true, and would not be awarded to the usual landlord on breach of a contract. The award could only have been made and justified because Curacao was a government.

The difficulty for Solitron is that, assuming (but without deciding) that it was error for the arbitrators to award such damages, it is not the function of a court to correct such an error. The statute specifies the grounds for vacating an award (9 U.S.C. § 10) but error in fact or law is not among them. Amicizia Societa Nav. v. Chilean Nitrate, etc. Corp., 274 F.2d 805, 808 (2d Cir. 1960). As has recently been said: "arbitrators are not bound by principles of

substantive law or rules of evidence". Lentine v. Fundaro, 29 N.Y.2d 382, 385, 328 N.Y.S.2d 418, 421, 278 N.E.2d 633, 635 (Breitel, J., 1972).

Solitron had an opportunity to urge this point before the arbitrators or in the courts of Curacao but elected to forego the opportunity. This Court may not now correct the alleged error.

Many years ago, the principle was stated by the Court of Appeals of New York that a foreign judgment was conclusive on the merits. The Court said (Dunstan v. Higgins, 138 N.Y. 70, 74, 33 N.E. 729, 730 (1893); emphasis supplied): "It is the settled law of this state that a foreign judgment is conclusive upon the merits. It can be impeached only upon proof that the court in which it was rendered had not jurisdiction of the subject-matter of the action or of the person of the defendant, or that it was procured by means of fraud. . . . But even if it appeared in this case, as it does not, that some legal right of the defendant was denied in refusing the application, that would not affect the validity or conclusive nature of the judgment, so long as it stood unreversed and not set aside. Legal errors committed upon the trial or during the progress of the cause may be corrected by appeal or motion to the proper court, but they furnish no defense to an action upon the judgment itself. Where a party is sued in a foreign country upon a contract made there, he is subject to the procedure of the court in which the action is pending, and must resort to it for the purpose of his defense, if he has any, and any error committed must be reviewed or corrected in the usual way. *So long as he has the benefit of such rules and regulations as have been adopted or are in use for the ordinary administration of justice among the citizens or subjects of the country, he cannot complain, and justice is not denied to him. The presumption is that the rights and liability of the defendant have been determined according*

14

*to the law and procedure of the country where the judgment was rendered. . . ."*

10.

The other objections made by Solitron have been considered and found to have no merit.

Both under the federal law and the law of New York, the award and judgment must be enforced.

■ With reference to Chapter 2 of Title 9 of the Code, the House Committee Report stated that this legislation would "serve the best interests of Americans doing business abroad by encouraging them to submit their commercial disputes to impartial arbitration for awards which can be enforced in both U.S. and foreign courts." U.S.Cong. & Admin.News, p. 3602 (1970). It is apparent that the whole purpose of the legislation was to encourage the arbitration of disputes arising out of transactions by American business in foreign countries. There is every reason to enforce the award and judgment in the case at bar.

■ The so-called counterclaim in the answer of Solitron is concluded by the award and the judgment. The arbitrators have given Solitron credit for the equipment which is the subject of the counterclaim.

■ The motion is granted. There will be judgment in favor of Curacao against Solitron for 445,682.35 Netherlands Antilles guilders, to be converted into United States dollars at the rate prevailing on the date of judgment (Deutsche Bank v. Humphrey, 272 U.S. 517, 47 S.Ct. 166, 71 L.Ed. 383 (1926); Conte v. Flota Mercante, 277 F.2d 664, 670–71 (2d Cir. 1960)) with interest thereon at 6% from July 10, 1970 to the date of judgment; and for $9,165 in addition, with interest thereon at 6% from August 13, 1970 to the date of judgment. There will be judgment dismissing the counterclaim on the merits.

Settle judgment on notice.