The ISLAND TERRITORY OF
CURACAO, Appellee,

v.

SOLITRON DEVICES, INC., Appellant.

No. 99, Docket 73–1664.

United States Court of Appeals,
Second Circuit.

Argued Nov. 15, 1973.

Decided Dec. 26, 1973.

Paul Windels, Jr., New York City (Windels, Merritt & Ingraham, Francis E. Koch, New York City, of counsel), for appellant.

Edward C. Wallace, New York City (Weil, Gotshal & Manges, Harold Klapper, New York City, of counsel), for appellee.

Before KAUFMAN, Chief Judge, and SMITH and OAKES, Circuit Judges.

OAKES, Circuit Judge:

This appeal is by an American manufacturer, the respondent below, from a judgment of the district court granting a petition by The Island Territory of Curacao (Curacao) to confirm an arbitration award made in its favor and to enforce a judgment entered thereon in the courts of Curacao. The arbitration itself arose out of a dispute over a contract, the parties to which were the Central Government of the Netherlands Antilles and The Island Territory of Curacao, both of these political entities being a part of the Kingdom of the Netherlands, and Solitron Devices, Inc. (Solitron), a manufacturer of electronic products from Rockland County, New York, relative to the construction of an industrial park in Curacao and the installation of a Solitron manufacturing facility in the park. Solitron did not participate in the arbitration proceeding in Curacao or in the judicial proceedings in confirmation of the award in Curacao, as to which it had a right under the law of Curacao to bring an action to an-

nul the award. Assorted defenses were urged below and found wanting by the district court, which held that the arbitration award was enforceable under the provisions of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, implemented by Title 9 of the United States Code Chapter 2 (§§ 201–208 inclusive), and that the judgment of Curacao was enforceable under Article 53 of the New York Civil Practice Law and Rules, CPLR §§ 5301–5309 McKinney's Consol.Laws c. 8 inclusive, entitled Recognition of Foreign Country Money Judgments.

Because the facts are set forth in extensive detail in Judge Wyatt's capable opinion below, The Island Territory of Curacao v. Solitron Devices, Inc., 356 F. Supp. 1 (S.D.N.Y.1973), we will state them only generally for purposes of ease of comprehension here. Suffice it to say that the underlying written agreement between Curacao and Solitron which was executed in Curacao on January 12, 1968, provided basically that, because Solitron wanted an electronics plant there and Curacao and the Netherlands Antilles wanted to attract industry to the islands and create jobs, Curacao agreed to establish an industrial park of about 60 acres and to construct two factory buildings pursuant to Solitron-approved plans and to build an access road and sea water pipes to the building sites; Solitron was to lease the buildings for 20 years at a specified rent and to operate in the larger building and to use or sublease the smaller one, agreeing to put its electronic manufacturing industry into operation within 12 months of completion of the larger building and to "create" at least 100 jobs. Solitron also undertook to "establish itself or otherwise prior to January 1, 1974 manufacturing industries not yet established in the Netherlands Antilles which will in total provide employment for at least 3,000 persons" (including Solitron's own employees). It was agreed that the laws of the Netherlands Antilles would be applicable to the agreement and that all disputes as a consequence of or in connection with it, legal as well as factual,[1] should be submitted to a board of arbitration, the decision of which would be binding. The usual provisions were made for designation of one arbitrator by Solitron and Curacao; they were in turn to designate a third arbitrator or, failing an appointment, to have one designated or appointed by the president of the Court of Justice of the Netherlands Antilles. The arbitrators were enjoined to give an award "like good men and true"—"ex aequo et bono." There was a provision that Solitron would "invariably"—retranslate as "irrevocably"—fix as its domicile for everything pertaining to the execution of the agreement as well as "for all acts of judicial execution," the office of a notary public who also was Solitron's attorney in Willemstad, Curacao.

Exchanges of correspondence incorporated as appendices to the affidavit of counsel for Curacao in the district court and statements in the opposing affidavit executed by the president of Solitron indicate that by April 13, 1970, Curacao had completed the two buildings as agreed, but that Solitron had failed to enter into a lease agreement, had failed to pay the costs of maintenance or to insure the buildings as required, and had otherwise treated the agreement as unilaterally terminated by Curacao. Solitron declined to proceed to arbitration on the basis that there had been express representations made regarding the favorable economic climate of Curacao particularly in respect to wage rates and availability of labor at those rates, namely, approximately 45 United States cents per hour. What had happened was a change in government and a revision upward of the minimum hourly rate of wages to $1.10 (U.S.) in January of

---

1. In short, the arbitration clause was of the broadest type, reserving no issues for resolution in the first instance by any tribunal, judicial or otherwise. *See generally* Note, The Consequences of a Broad Arbitration Clause Under the Federal Arbitration Act, 52 B.U.L. Rev. 571 (1972).

1970. Solitron conceded that the electronics industry was exempted from the minimum wage increase but, quoting from counsel's letter to Curacao of May 15, 1970, claimed that as a practical matter "there is no prospect of our being able to hire employees for less than it" and this "new wage rate destroys the economic advantage of manufacturing in Curacao." Other claims are set forth in the opposing affidavit of Solitron's president, but these are what might be called window dressing, since the real claim was, as the letter of May 15 stated, that "By its own act, therefore, your government made it impossible for us to perform the agreement in question, thereby terminating the agreement and any obligation to arbitrate that we may have under it." [2] These "window dressing" claims were based on the eruption of "violent riots in Curacao" with the "business areas of Willemstad . . . in flames" and the riots being directed "immediately against foreign interests," etc.

The arbitration proceeded without Solitron's participation, but Solitron was duly informed at all times of the time and dates of hearings and the other procedures followed. The award was made and signed by the arbitrators in Curacao on August 13, 1970, and in substance, as the district court pointed out, 356 F. Supp. at 8, was in favor of Curacao's position but by no means accepted all of the claims of Curacao as to damages. Thus, while the arbitrators found that Solitron was in breach of contract by omission to lease the completed buildings, they also found that Curacao could not recover as damages its 1,521,000 Netherlands Antilles guilders (NAfls) investment costs in respect to the buildings, although they did allow 53,602 NAfls as the cost of an acid neutraliza-

tion plant because it was intended uniquely for Solitron. On the theory that it was virtually certain that Curacao could not find another lessee before July 1, 1971, at the earliest, the arbitrators allowed 192,482 NAfls for loss of rent on the two buildings for the period from December 1, 1969, to July 1, 1971, and a small amount as damages on account of fire insurance premiums paid.

The only item that really is complained about by Solitron in its brief, and which strikes us as unusual, is the award of 375,000 NAfls as reflecting the present value discount of an award of 423,671.35 NAfls for the period December 1, 1970, to December 31, 1973, as damages for Solitron's failure to create 100 jobs as agreed. The basis of this award was that Curacao would have had 100 more unemployed in the period than otherwise and, under its laws, Curacao had to pay unemployment benefits and medical assistance to these unemployed persons. This award was computed by using 1969 statistics, with percentage increases for later years as could be expected. In turn, the unemployment benefits payable were computed on the basis that, of the 1,000 registered unemployed seeking a job with Solitron, some 75 per cent were "breadwinners with dependents," 10 per cent were "breadwinners without dependents," and 15 per cent were "non-breadwinners." Under Curacaoan law in 1969 apparently, "breadwinners" were entitled to 800 NAfls "financial assistance" and "non-breadwinners" were entitled to none, but each "breadwinner" and each dependent was entitled to 175 NAfls by way of "medical assistance."

Expenses to the amount of 90,000 NAfls covering foreign travel to establish industries regarding the buildings were allowed, but Solitron was granted

---

2. This claim can be read as an allegation of fraud in the inducement to the contract or as "impossibility" of performance of the contract due to the acts of one party, Curacao, to the contract. On appeal, Solitron has chosen to characterize the question along "impossibility" lines in order to avoid the inescapable impact of Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 397, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967) (fraud in the inducement is a matter to be determined by the arbitrators), should the case be disposed of under the Federal Arbitration Act.

an overall set-off for the value of its structural steel and air conditioning plant to the extent of 266,424.05 NAfls. The arbitrators rejected a claim for the costs of prosecuting the arbitration but awarded interest and, as the original contract provided, one-half of the fees and expenses of the arbitrators. The arbitrators disallowed any claim of Curacao for damages for Solitron's failure to establish 3,000 jobs by January 1, 1974, on the ground that it "depends on so many factors at present entirely unknown and not readily predictable," even on the basis of expert advice, but left this question open for future submission. Similarly the arbitrators made no allowance for damages for failure to create the original 100 jobs beyond December 31, 1973, on the basis that it was not known whether there would be "structural unemployment" after January 1, 1974. As the district court found, "The award gives every indication of able, careful, and impartial work by the arbitrators." 356 F.Supp. at 10.

As the district court also found, after the award was made the law of the Netherlands Antilles was fully complied with in terms of filing the award, Curacao seeking the issuance of a "writ of execution" on the basis of the award, which was declared enforceable in the "Court of First Instance." While Solitron had the opportunity to take advantage of the provision in the Antilles law to bring an action to annul the arbitral award within three months from the filing of the award in court, it did not exercise it. The award and the judgment entered thereon were, as the district court held, final under the law of Antilles and a marshal "served" by mail to Solitron a writ based upon the award and judgment in Curacao. The district court went on to hold that objections by Solitron on the basis of lack of jurisdiction were frivolous because it had agreed in the original agreement to submit to arbitration in Curacao and that the laws of the Antilles should be applicable and, indeed, had agreed that it had a domicile in Curacao and an irrevocable agent for service of notice and process there. In this respect the district court was clearly correct. National Equipment Rental Ltd. v. Szukhent, 375 U.S. 311, 315–316, 84 S.Ct. 411, 11 L.Ed.2d 354 (1964); Reed & Martin, Inc. v. Westinghouse Electric Corp., 439 F.2d 1268, 1276–1277 (2d Cir. 1971); Gilbert v. Burnstine, 255 N.Y. 348, 174 N.E. 706 (1931).

■ Neither the jurisdictional point, nor that one of the arbitrators was a judge of a court in Curacao and hence was not impartial as a matter of law, is urged here. Rather, Solitron claims that the arbitral award is not enforceable under the Convention on Recognition and Enforcement of Arbitral Awards (Convention on Recognition), as implemented in 9 U.S.C. § 201 et seq., for the following reasons: (1) the construction of an industrial park is a "governmental" and not a "commercial" function, so that the Convention does not apply; (2) the arbitration award is not final and definite and is contrary to the public policy of the United States; and (3) the contract and the arbitration agreement terminated by reason of impossibility and, as a result of this termination, there was lack of jurisdiction in Curacao over Solitron. The claim is also made here, as it was below, that the judgment on the arbitral award is not enforceable under Article 53, the New York statute, because the Convention on Recognition and its implementing legislation have preempted the New York statute and because, under the terms of the New York statute as it has been construed, enforcement is not permitted here. In its reply brief Solitron also argues for the first time that the whole matter is governed by the Convention on the Settlement of Investment Disputes between states and nationals of other states which was ratified and adhered to both by the United States, [1966] 1 U.S.T. 1270, TIAS No. 6090, and the Netherlands, [1966] 1 U.S.T.

1355; 55 U.S. State Dept.Bull. 596 (1966).[3]

■ We deal first with the question under New York law, whether the foreign judgment is enforceable.[4] The first question is whether Article 53, permitting the enforcement of a foreign money judgment, has been preempted by the overriding federal law implementing the Convention and relating to the enforcement of foreign arbitral awards, 9 U.S.C. § 201 et seq. The Convention on Recognition in no way purports to prevent states from enforcing foreign money judgments, whether those judgments are rendered in the enforcement of an arbitration award or otherwise. This is not to say that Solitron's argument is not, indeed, ingenious, since it apparently was not made in the sole case decided under Article 53 or any prior thereto in which the courts of New York State have granted enforcement to foreign judgments based upon foreign arbitration awards arising after the United States Senate's accession to the Convention, albeit with reservations, on October 4, 1968; and the adoption by the Congress of 9 U.S.C. ch. 2 on July 31, 1970.[5] New Central Jute Mills Co. v. City Trade & Industries, Ltd., 65 Misc.2d 653, 318 N.Y.S.2d 980 (Sup.Ct.1971).[6]

3. This afterthought we find to have no merit whatsoever, since the Convention in its preamble points out that it applies only where there is "mutual consent by the parties to submit . . . disputes to conciliation or to arbitration through . . . facilities" established under the Convention and the jurisdiction of the "International Center for Settlement of Investment Disputes" constituting such facilities under Article 25 of the Convention, [1966] 1 U.S.T. 1280, only extends to "any legal dispute . . . which the parties to the dispute consent in writing to submit to the center . . . ." That is to say, this Convention, which operates under the auspices of the International Bank for Recovery and Development, is purely a voluntary device for arbitration and is by no means intended to preclude other forms of arbitration or settlement of international disputes, investment or otherwise.

4. We need not deal with the question—not argued by the parties and not touched upon in the briefs—whether the action on the arbitration award was merged in the Curacaoan judgment. See Restatement of Judgments § 47. See also Pepper v. Bankers Life & Casualty Co., 414 F.2d 356 (8th Cir. 1969). This would presumably be a matter of Curacaoan law in the first instance. See Restatement (Second) of Conflict of Laws §§ 218, 187(2) & 188. By first addressing ourselves to the question whether or not the Curacaoan judgment confirming or enforcing the award is enforceable qua judgment, we avoid the question—raised implicitly, if not directly by the appellant—whether the cause of action or, more particularly, the nature of damages awarded for breach of the covenant to create jobs by way of equating such damages with welfare payments that are required to be paid in Curacao, is so contrary to the strong public policy of the forum—a question which we need not decide and on which we express no opinion—that the award might not be enforceable qua award (whether under the Federal Arbitration Act or otherwise). Cf. Benton v. Singleton, 114 Ga. 548, 40 S.E. 811 (1902) (gambling contract).

5. For some of the legislative history in connection with the adoption of 9 U.S.C. Ch. 2, see H.R.Rep. 1181, reprinted in 1970 U.S. Code Cong. & Ad.News p. 3601 et seq. The Committee points out that "so far as is known, there is no opposition to the bill" and "in the Committee's view, the provisions of S. 3274 will serve the best interests of Americans doing business abroad by encouraging them to submit their commercial disputes to impartial arbitration for awards which can be enforced in both U.S. and foreign courts." Id. at 3602. The Committee, of course, recognized the obvious distinction between an award as such and the enforcement of an award, whether in a United States or foreign court, and to that extent, at least, appears to recognize the distinction between suing on the award and suing on a foreign judgment confirming or enforcing the award. It would appear that the Convention itself, and the United States enabling legislation, is addressed to the situation in which there may not be jurisdiction over the United States person or corporation for purposes of awarding a foreign judgment even though there may be jurisdiction for the making of a foreign arbitral award.

6. Article 53 was principally a codification of pre-existing New York case law permitting the enforcement of foreign country money judgments. See Judicial Conference Report, 2 McKinney's Session Laws of New York 2784 (1970). There were a number of decisions of the courts of New York granting enforcement to foreign judgments based

It is not insignificant that the Federal Arbitration Act itself makes a very clear distinction between action on an award and action on a judgment enforcing the award, pointing out that application for an order confirming the award may be made only when "the parties in their agreement have agreed that a judgment of the court shall be entered upon the award . . ." and on certain other conditions, subject to certain other qualifications. 9 U.S.C. § 9. This very important difference was, indeed, the key to our own recent decision in Varley v. Tarrytown Associates, Inc., 477 F.2d 208 (2d Cir. 1973), where we held that, because the parties in their contract to arbitrate had not agreed that a judgment of the court could be entered upon the award, there was no consent to the entry of judgment thereon. We hold, then, that, since the Convention on Recognition itself and its enforcing legislation go only to the enforcement of a foreign arbitral award and not to the enforcement of foreign judgments confirming foreign arbitral awards, New York state law is not preempted to the extent that it permits, regulates and establishes a procedure for the enforcement of the foreign money judgment. Thus it cannot be doubted that the policy of New York State to recognize foreign judgments "prevails in the absence of interference with the federal regulatory scheme." Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware, 414 U.S. 117, 94 S.Ct. 383, 396, 38 L.Ed.2d 348 (Dec. 4, 1973).

It remains then to be seen whether under New York law the Curacaoan judgment may be enforced and, in this respect, it is helpful to recall, *see* note 6 *supra*, that Article 53 itself represents a codification of pre-existing common law on the subject. Thus, for example, the district court was plainly correct in its holding, not contested on appeal, that a claim of fraud in the inducement of the contract generally—alleged here on the basis of supposed representations that the wage structure in Curacao would remain stable—is a question for the arbitrators. Prima Paint Corp. v. Flood & Conklin Manufacturing Co., 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967); Weinrott v. Carp, 32 N.Y.2d 190, 194, 344 N.Y.S.2d 848, 298 N.E.2d 42 (1973). This carries with it as the district court quite properly held the claims that the contract itself terminated or was frustrated by virtue of the changes in wage rates in Curacao and legislation changing the minimum wages for non-electronic industry employees as well as by the supposed riots and change in personnel of government.[7]

We thus turn to the other points on the basis of which the appellant claims that under New York law and under Article 53 enforcement of the Curacaoan judgment would not be granted. Concededly one of the bases on which New York would not enforce a foreign judgment would be if it were made without jurisdiction. NYCPLR § 5304(a)2. Appellant argues that jurisdiction over it ended in March of 1970, but the basis for this argument is that the contract terminated as a matter of law by reason of impossibility of performance, and this again goes to the change of the minimum wage law imposed by Curacao. The March, 1970, date for "termination" is based upon Solitron's counsel's self-serving letter of May 15 to the effect that performance had by then become economically impos-

---

upon foreign arbitral awards. *See, e. g.,* Gilbert v. Burnstine, 255 N.Y. 348, 174 N.E. 706 (1931); Johnston v. Compagnie Generale Transatlantique, 242 N.Y. 381, 152 N.E. 121 (1926); Coudenhove-Kalergi v. Dieterle, 36 N.Y.S.2d 313 (Sup.Ct.1942); von Engelbrechten v. Galvanoni & Nevy Bros., 59 Misc.2d 721, 300 N.Y.S.2d 239 (Civ.Ct.1969).

7. The same argument might be rejected on the basis that Curacao having acted by granting judgment on the arbitral award was engaged in an act of state which, under Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), and related cases, we should not and indeed may not go behind to determine the validity of the judgment or whether we should give credit to it. *See* Restatement (Second) of Foreign Relations Law of the United States § 41.

sible. We would point out again that this was, under the broad arbitration clause, initially a question for the arbitrators and was ruled upon and rejected by them. There is nothing in the contract to indicate that Solitron's obligations were predicated on the continued existence of any particular wage rate. Only recently the Fifth Circuit held in Eastern Marine Corp. v. Fukaya Trading Co., 364 F.2d 80, 84–85 (5th Cir.), cert. denied, 385 U.S. 971, 87 S.Ct. 508, 17 L.Ed.2d 435 (1966), that, as a matter of federal substantive law, an arbitration clause survives the frustration of a contract for the purposes of settling, among other things, whether the contract has in fact been frustrated. *See also* Heyman v. Warwins, [1942] A.C. 356, 366, relied upon by Judge Augustus Hand in In re Pahlberg, 131 F.2d 968 (2d Cir. 1942); Prima Paint Corp. v. Flood & Conklin Manufacturing Co., *supra.* In re Kramer & Uchitelle, 288 N.Y. 467, 43 N.E. 2d 493 (1942), heavily relied upon by appellant for the proposition that, at least as a matter of New York law, a proceeding to enforce an arbitration contract presupposes the existence of a valid and enforceable contract at the time the remedy is sought, has been limited, In re Exercycle Corp., 9 N.Y.2d 329, 335–336, 174 N.E.2d 463, 465–466, 214 N.Y.S.2d 353, 356–358 (1961), to the situation in which public policy as embodied in a statute forbids the performance which is the subject of dispute, a policy and statute which are as binding upon the arbitrators as upon the courts. That, of course, is not the situation here, where the defense of frustration is one asserted purely as a common law contractual defense.

■ On its jurisdictional point, Solitron also argues, however, that its contractual concession of jurisdiction on the basis of the provision that it "invariably" or irrevocably chose domicile at the offices of its attorney-notary public in Willemstad cannot of itself be sufficient. The argument is not that its consent to jurisdiction was revoked, and indeed could not be because Curacao had already invoked arbitration under the agreement by the time of Solitron's attempted revocation of its consent to jurisdiction on May 12, 1970. Rather, the Solitron argument is to the effect that the document in the nature of a "marshal's writ," which was issued after the "Court of First Instance" "declared executed" the "arbitral verdict," contained language to the effect that "respondent [Solitron] is no longer domiciled in the Netherlands Antilles," and that this language represents a concession on the part of Curacao that Solitron's domicile terminated no later than March, 1970. There are at least three answers to this argument:

1. If Solitron's domicile had terminated in March of 1970, why did it wait until May 12, 1970, to cable its agent for service of process to revoke "such authority if any as you may still retain to represent us," confirming this by cable and letter dated May 13, 1970?

2. Solitron's attempt to claim that its domicile was terminated because of impossibility of performance assumes, incorrectly, that it, rather than the arbitrators, had the power to decide that issue, a matter which we have already held adversely to Solitron above.

3. The language of the Curacaoan marshal's writ in context at most constitutes an acknowledgment of the fact that the attempted revocation in May of 1970 had become effective by the date of the marshal's writ in April of 1971 (a matter which we need not and do not affirmatively decide here). That is to say, the marshal's language to the effect that the respondent is no longer domiciled in the Netherlands Antilles relates to the time of the issuance and presentation of the writ in April, 1971.

■ Appellant argues strenuously, and on two different bases, that—to the extent that the arbitral award consists of damages in lieu of welfare payments that Curacao would have had to make as a result of Solitron's breach of the obligation to create 100 jobs—the award is unenforceable and, therefore, a judg-

ment based upon it is unenforceable under New York law.[8] These two bases urged are, first, that New York will vacate an arbitral award if the arbitrators' construction of a document is "completely irrational." Lentine v. Fundaro, 29 N.Y.2d 382, 385, 278 N.E.2d 633, 635, 328 N.Y.S.2d 418, 422 (1972). The other is that there are some matters, such as the custody of children, Hill v. Hill, 199 Misc. 1035, 104 N.Y.S.2d 755 (Sup. Ct.1951), and the distribution of decedents' estates, Swislocki v. Spiewak, 273 App.Div. 768, 75 N.Y.S.2d 147 (1st Dep't 1947), leave to appeal denied, 273 App. Div. 808, 76 N.Y.S.2d 269 (1948), which are simply not subject to arbitration under New York law. It is Solitron's point that Solitron did not accept a delegation to it by Curacao of the "sovereign duty to provide social welfare payments to any part of the unemployed on the island." But this, of course, entirely misses the point that what the arbitrators were doing—and in a very cautious way they did it, with basis in fact—was attempting to fix damages for the purpose of ascertaining the extent of Solitron's liability for breach of its conceded obligation under the agreement to create 100 jobs. While an American court in similar circumstances, or an American board of arbitrators, might not necessarily follow the same route, in ascertaining damages, here it must be remembered that this was obviously an underdeveloped country with a large number of unemployed; indeed the basis of the award was that there were 1,000 unemployed people seeking the 100 new jobs with Solitron and there was expert testimony by the head of the unemployment service of the Island Territory adduced before the arbitrators that for 1969 the Island Territory would have had to pay in respect to those employees sums pursuant to its laws relating to financial and medical assistance, the sums varying as above

pointed out. It may be that the arbitrators improperly assumed that the same payments by way of financial aid had to be made for 1970 and 1971, 1972 and 1973, and indeed pursuant to the expert testimony the arbitrators took into account a 10 per cent increase for "financial assistance" and 6½ per cent for "medical assistance." The arbitrators' findings were also based upon "the expected increase in population, the time required for preparing for the establishment of new businesses and the extent of the structural unemployment existing in Curacao." Any objections to this method of computing damages or to the assumptions made by the arbitrators could have been presented to them or, indeed, might well have been presented in judicial proceedings which could have been brought by Solitron to annul the arbitration award in Curacao. They come too late here, however, and they by no means take into account the proposition to the contrary—which we need not pass upon—that, by virtue of the institutional nature and commercial relationship of the parties, remembering that Curacao itself was a government with large numbers of unemployed people, the method of ascertaining damages may well have been a fair and proper one. Solitron points to no New York statutory law that adopts a policy contrary to that agreed to by the parties here in their contract and implemented by the arbitrators. In this posture, Solitron's argument under state law must fail, *see* In re Exercycle Corp., *supra;* New Central Jute Mills Co. v. City Trade & Industries, Ltd., *supra,* in this concluded arbitration proceeding. *Cf.* Amicizia Societa Navegazione v. Chilean Nitrate & Iodine Sales Corp., 274 F.2d 805, 808 (2d Cir.), cert. denied, 363 U.S. 843, 80 S.Ct. 1612, 4 L.Ed.2d 1727 (1960).

The next argument by appellant is that it is contrary to the public policy

---

8. We emphasize that whether the award would be enforced under New York law, a question not before us here, and whether the judgment would be recognized under Article 53 are entirely separate and distinct questions. Indeed, some of the arguments advanced by Solitron with respect to New York "policy" might well be persuasive were this an action to enforce the award under New York law.

of New York to permit a person to derive an advantage from his own wrong, *see* Riggs v. Palmer, 115 N.Y. 506, 22 N.E. 188 (1889), and violation of New York public policy is a ground for refusing to enforce the Curacaoan judgment under NYCPLR § 5304(b)4. The claim is, once again, that Curacao is attempting to take advantage of its own wrong in that it altered the prevailing wages after having induced Solitron to establish a plant on the basis that the wage rates would be stable so that Solitron would be in a competitive position with other "offshore" manufacturers of semi-conductors. While undeniably Curacao had the power to fix wages, Solitron says, the power to hold Solitron in breach of an agreement after Curacao had made it "impossible" for it to perform the agreement is something else again. Of course, this is just another way of restating the same argument which was rejected factually by the district judge. In the light of the papers submitted we cannot help but agree with Judge Wyatt. There was clearly no representation or warranty in the agreement itself that the wages would remain stable. This may well have been Solitron's hope and, indeed, this conceivably may have been the hope of the Curacaoan government—though it could be doubted—at the time the contract was entered into. But it is absurd to suppose that a sophisticated American manufacturer would expect a 45-cent an hour wage rate to last indefinitely on the Island. In no way, despite more than adequate legal advice, did Solitron attempt to make the wage-rate factor one of the terms ·or conditions of the agreement. It is interesting to note that the arbitrators considered this argument as having been put forth—despite Solitron's failure to participate in the arbitration—by Solitron's counsel by letter to the Island Territory of May 15, 1970. The arbitrators conceived of it as a defense amounting to a plea of mistake as to the identity of the thing contracted for, and they indicated that under the law of the Netherlands Antilles

such a mistake may lead to judicial annulment of the contract in question, but only when there are both reasonable grounds for believing that the party under the mistake would not have entered into the contract had he known the circumstance assumed to be present was in fact absent, and that the other party, in this case Curacao, ought to have realized that the presence of the circumstance—here the low wage rate—was the real reason for entering into the contract. As the arbitrators themselves pointed out, "that the wage level prevailing at the time of concluding the Agreement was attractive to Solitron is understandable; but it is quite unacceptable that, *on the basis of that wage level*, Solitron could have felt able to commit itself to operating a business for twenty years, let alone that the Island Territory ought to have realized this." Apparently witnesses testified before them to the effect that indeed no assurance was given that the low wages would be maintained or that Solitron would not have to deal with labor unions. The finding of the arbitrators certainly seems sound on the basis of our independent review of the documents and affidavits submitted to the court below, as it did to the district court itself. It is absurd to think that, if the maintenance of the wage rate were a condition or term of the agreement, it would not have been incorporated into the agreement by way of warranty, covenant or otherwise in light of the fact that Solitron was in a perfectly strong bargaining position, well represented by skilled and learned counsel, with presumably sophisticated and worldly business management at the helm. We see nothing to justify the claim that Curacao was "deriving an advantage from its own wrong." Higher wage rates, whether or not as a result of the change in governmental personnel (and there is no indication that the government as such was overthrown), and whether or not as the result of agitation, were a business risk that Solitron took; it ill behooves the company now to claim otherwise.

■ The last point made in reference to the Curacaoan judgment is that under NYCPLR § 5302 only a final and conclusive judgment may be enforced in New York. The judgment, it is claimed, is not conclusive or final since the arbitration award left it open to either party, after January 1, 1974, to demand further arbitration and possibly to obtain further and more extensive damages. But this is a point that was not raised before the Curacao courts. By the very terms of the New York statute, the question before us, as it would be before a New York court, is whether the judgment obtained in Curacao is "final . . . where rendered." NYCPLR § 5302. We have already noted that the potential for appellate review of the award in the courts of Curacao ceased when Solitron failed to seek such review within three months of the award. Logic would seem to compel the conclusion, as the district court found, that the judgment rendered on the award in Curacao would be viewed in Curacao as "final" and Solitron presents no evidence to the contrary. Indeed, it is still open to the appellant to raise the question whether further damages may be awarded in the event that further arbitration or confirmation of another arbitral award is sought in the courts of the Netherlands Antilles. For all we know, those courts may very well take the view that any claim for breach of the contract, whether pertaining to present, past or future damages, must be made and proved with sufficient particularity at the time of the arbitration, in the absence of which the party seeking damages for breach of contract will be precluded. The courts of Curacao may, as a matter of Netherlands Antilles law, take the position that the breach of contract was merged in the arbitration award, the arbitration award merged in the judgment, and that any further arbitration is not permissible. *See* note 4 *supra.* They may take quite the opposite view, of course, and we are not ourselves sufficiently versed in the law of the Netherlands Antilles, nor have the parties attempted to aid us in this respect, that we can with any assurance predict what the Curacao courts will do. We must recognize that the judgment itself is definite in amount, was conclusive and enforceable in Curacao, and, indeed, is final to the extent that it specifies precisely what Solitron is to pay; nothing remains to be calculated.[9]

■ Thus we conclude that the judgment of Curacao was enforceable under Article 53 of the New York Civil Practice Law and Rules and affirm the district court on this ground. In so holding we need not determine the correctness of the alternative ground advanced by the district court that the arbitration award was independently enforceable under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, by virtue of 9 U.S.C. § 201 et seq. The argument that Solitron may counterclaim for its investment in Curacao is absurd, since credit was already given for this in the arbitral award.

Judgment affirmed.

9. Should the arbitrators in a subsequent proceeding decide that further damages are warranted, and should appellee have to bring another action in a federal court to enforce the judgment on such an award, a federal court would then be in a position to gauge the "finality" accorded to the instant judgment by the courts of Curacao. What Solitron asks us to do here is to look behind the present judgment and either deny its recognition or resolve in its favor the question whether Curacao will be entitled to recognition of a hypothetical judgment for future damages; the time is simply not ripe for such a determination. Even were we to take the view that future proceedings in Curacao might lead to "modification" of the present judgment, our concern would be limited to due process considerations:

considerations of due process probably require that enforcement be refused to the extent that modifications could be sought in the rendering jurisdiction, unless the requested court allows the defendant to litigate the issues which would entitle him to modification.

von Mehren & Trautman, Recognition of Foreign Adjudications: A Survey and a Suggested Approach, 81 Harv.L.Rev. 1601, 1658 (footnote omitted). *Cf.* Griffin v. Griffin, 327 U.S. 220, 66 S.Ct. 556, 90 L.Ed. 635 (1946).