16. In accordance with 42 U.S.C. § 2000e–5(k), this Court will allow plaintiff's attorney an attorney's fee of $400.00.

Application of ANTCO SHIPPING COMPANY, LIMITED, Petitioner,

v.

SIDERMAR S. p. A., Respondent.

For an Order and Judgment pursuant to Article 75, CPLR staying a certain proposed arbitration.

In the Matter of the arbitration between

SIDERMAR S. p. A., Cross-Petitioner,

and

ANTCO SHIPPING COMPANY, LIMITED and New England Petroleum Corporation, Cross-Respondents.

No. 76 Civ. 2126–CSH.

United States District Court, S. D. New York.

June 28, 1976.

Eaton, Van Winkle & Greenspoon, Samuel N. Greenspoon, New York City, for petitioner and cross-respondent Antco Shipping Co., Limited and cross-respondent New England Petroleum Corp.

Burlingham, Underwood & Lord, John F. O'Connell, New York City, for respondent and cross-petitioner Sidermar S. p. A.

*Memorandum*

HAIGHT, District Judge:

Antco Shipping Company, Limited ("Antco") petitioned the New York State Supreme Court for a stay of arbitration proceedings demanded by Sidermar S.p.A. ("Sidermar"). Sidermar removed the proceeding to this Court, and cross-petitioned for an order directing Antco to proceed to arbitration. In its cross-petition, Sidermar also prays that New England Petroleum Corporation ("Nepco"), as alleged guarantor of Antco's pertinent contractual obligations, be directed to arbitrate with Sidermar. Sidermar's cross-petition is predicated upon the United States Arbitration Act, 9 U.S.C. §§ 1, 4 and 206.

The Court denies Antco's petition for a stay of arbitration, and grants Sidermar's cross-petition for an order directing a consolidated arbitration between Sidermar, Antco and Nepco.

*The Contract*

The case arises out of a contract of affreightment dated as of February 13, 1973 between Sidermar, as owner of unnamed vessels, and Antco as charterer. Part "A" of the contract covered a period of one year, commencing August 1/October 31, 1973, and called for the ocean carriage of 500,000 tons of crude oil. Part "B" was for a period of five years, commencing April/July 1974, and called for the ocean carriage of 1,100,-000 tons of crude oil per year.[1]

Parts "A" and "B" of the contract both provide, in respect of loading and discharging ports, as follows:

"ARTICLE 4

"Loading One (1) or two (2) safe port(s) Mediterranean Sea, *excluding Israel,* or in case of necessity, at Charterer's option, (1) one or two (2) safe port(s) Nigeria.

If two load ports used, such ports to be in rotation East/West. However if a mandatory situation should arise Owner to agree to a rotation out of this order with a mutually agreed compensation so as to keep Owner whole.

---

1. The contract quantities were 10 per cent more or less at Sidermar's option, with liftings evenly spread.

"ARTICLE 5

"Discharging One (1) or two (2) safe port(s) Bahamas or other Caribbean port(s) excluding Cuba, or at Charterer's option one (1) or two (2) safe port(s) United States Atlantic Coast." (emphasis added).

Each part also provided, in Article 9, as follows:

"Owners shall supply Charterers forty-five (45) days prior to each quarterly period, a tentative schedule of lifting dates and quantities for that period. *It is understood that Owners intention is to perform this contract with combined carriers which will load dry cargoes for their own account as back-haul voyage to Mediterranean.* The dry cargo trade could involve delays at loading and discharging ports as well as lack of cargoes and same would compel Owners to divert the ships to other loading ports. For all the above considerations Owners deem it would be very difficult to give Charterers exact scheduling. They can only undertake to keep Charterers continuously posted of vessel's position." (emphasis added).

The voyages called for by Part "A" of the contract were performed.[2] One lifting of cargo took place under Part "B", the M/T MARCUS LOLLIGHETTI loading 1,024,624 barrels of fuel oil at Libyan ports in June, 1974 for carriage to Freeport, Bahamas. Antco then totally ceased performance of the contract.[3]

Sidermar, claiming a breach of contract by Antco, demanded arbitration with Antco and Nepco as the latter's guarantor. The contract provides for arbitration. Parts "A" and "B" both provide, in Article 22:

"The provisions of Part II of the Essovoy (1969) form of Charter attached hereto are incorporated in this Contract by reference and shall apply to each voyage. Wherever there shall be any conflict be-

tween the Contract and the Essovoy (1969) form, the Contract shall govern."

Article 23 provides:

"If arbitration becomes necessary under Clause 24 of Essovoy (1969) such arbitration shall be held in New York, New York."

Clause 24 of the printed Essovoy (1969) form, attached to the contract, provides in pertinent part:

"Arbitration. Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of New York or in the City of London whichever place is specified in Part I of this charter pursuant to the laws relating to arbitration there in force, before a board of three persons, consisting of one arbitrator to be appointed by the Owner, one by the Charterer, and one by the two so chosen. The decision of any two of the three on any point or points shall be final. Either party hereto may call for such arbitration by service upon any officer of the other, wherever he may be found, of a written notice specifying the name and address of the arbitrator chosen by the first moving party and a brief description of the disputes or differences which such party desires to put to arbitration. * * * "

By separate letters dated April 19, 1976, Sidermar named Franklin G. Hunt, Esq., as its arbitrator, and demanded that both Antco and Nepco, its corporate parent, arbitrate Sidermar's claim for approximately $14,000,000 arising out of Antco's breach and repudiation of the contract. The claim against Nepco is founded upon a written guarantee given by Nepco under date of November 1, 1973, which is addressed to Sidermar and reads:

"In the event that Antco Shipping Company Ltd. ("ANTCO"), a Bahamian corporation, fails to perform its duties and

---

2. Sidermar says that some disputes have arisen out of those Part "A" voyages, but does not specify what they are.

3. The reason why Antco ceased performance does not appear from the motion papers. On Antco's view of the case, the reason is irrelevant.

obligations as Charterers, under the Contract of Affreightment (Part "A" and Part "B") dated February 13, 1973 between Sidemar S.P.A. [sic] as owners and Antco as Charterers, then New England Petroleum Corporation hereby guarantees to fulfill and perform any and all legal obligations that Antco may be liable for as Charterers under said Contract of Affreightment."

*Antco's Petition for a Stay of Arbitration*

Antco contends that the entire contract of affreightment, including the arbitration clause, is illegal and unenforceable because it contravenes the public policy of the United States and the State of New York. Consequently, the argument runs, either party could with impunity cease performance of this illegal contract at any time it chose, leaving the other party with no remedy that the law will enforce.

Sidermar denies any illegality, and appeals to that public policy of the United States which encourages and enforces international arbitration agreements.

Antco's charge of illegality is based upon the provision in Article 4 of the contract "excluding Israel" from Mediterranean loading ports. Antco characterizes that provision as a boycott or blacklist of Israel, a nation friendly to the United States.

An expression of public policy condemning this boycott is said to be found in the Export Administration Act of 1969, 50 U.S. C.App. §§ 2401–2413. That statute took effect upon the expiration of the Export Control Act of 1949, 50 U.S.C.App. §§ 2021–2032.

Section 3 of the 1969 Act, 50 U.S.C.App. § 2402, sets forth the "Congressional declaration of policy" underlying the statute. Antco places particular reliance upon § 2402(5), which reads in part:

"It is the policy of the United States (A) to oppose restrictive trade practices or boycotts fostered or imposed by foreign countries against other countries friendly to the United States, . . ."

Section 4(b)(1) of the Act, 50 U.S.C.App. § 2403(b)(1), provides:

"To effectuate the policies set forth in section 3 of this Act [section 2402 of this Appendix], the President may prohibit or curtail the exportation from the United States, its territories and possessions, of any articles, materials, or supplies, including technical data or any other information, except under such rules and regulations as he shall prescribe."

The President was given the power to delegate his responsibilities under the statute, 50 U.S.C.App. § 2403(e). By Executive Order No. 11533, dated June 4, 1970, the President delegated such responsibility to the Secretary of Commerce, with power of successive delegation. (Section 1 of Executive Order). The former Export Control Review Board was reestablished as the Export Administration Review Board (Section 2). The Secretary was authorized to refer to the Board "such particular export license matters" as he may select (Section 3).

Pursuant to statutory authority, the Secretary promulgated regulations which appear at 15 C.F.R. Part 369 under the caption "Restrictive Trade Practices or Boycotts". § 369.1 of the regulations reiterates the statutory declaration of policy "to oppose restrictive trade practices or boycotts fostered or imposed by foreign countries against other countries friendly to the United States." The regulations then go on to prohibit or enjoin certain acts by:

" . . . All exporters and related service organizations (including, but not limited to, banks, insurers, freight forwarders, and shipping companies) engaged or involved in the export or negotiations leading towards the export from the United States of commodities, services, or information, . . ." 15 C.F.R. § 369.2(a).

Antco's argument of illegality of contract follows this outline:

(1) The exclusion of Israeli loading ports constitutes a restrictive boycott imposed upon a friendly country. Antco says that the Court should take judicial notice "that

such provisions are inserted in contracts so as to win favor with Arab nations." [4]

(2) The Sidermar/Antco contract of affreightment "involves both exports and imports to the United States." [5]

(3) Therefore the loading port provision contravenes the public policy of the United States as expressed in the Export Regulation Act and the regulations promulgated thereunder.

(4) It follows, Antco argues, that the entire contract, including the arbitration clause, is illegal and unenforceable. Antco cites, among other authorities, *Hurd v. Hodge*, 334 U.S. 24, 68 S.Ct. 847, 92 L.Ed. 1187 (1947), which refused enforcement of covenants incorporated in conveyances of land and forbidding its rental, lease, sale, transfer or conveyance to any negro. Chief Justice Vinson said for the Court:

"The power of the federal courts to enforce the terms of private agreements is at all times exercised subject to the restrictions and limitations of the public policy of the United States as manifested in the Constitution, treaties, federal statutes, and applicable legal precedents. Where the enforcement of private agreements would be violative of that policy, it is the obligation of courts to refrain from such exertions of judicial power." 334 U.S. at pp. 34–5, 68 S.Ct. at p. 853.

Antco also relies on Section 296 of the New York Executive Law, amended as of January 1, 1976 to provide:

"13. It shall be an unlawful discriminatory practice (i) for any person to discriminate against, boycott or blacklist, or to refuse to buy from, sell to or trade with, any person, because of the race, creed, color, national origin or sex of such person, or of such person's partners, members, stockholders, directors, officers, managers, superintendents, agents, employees, business associates, suppliers or customers, or (ii) for any person wilfully to do any act or refrain from doing any

act which enables any such person to take such action. This subdivision shall not apply to:

"(a) Boycotts connected with labor disputes; or

"(b) Boycotts to protest unlawful discriminatory practices."

Antco argues that the contract has sufficient contacts with New York (including the provision for arbitration in New York) to render the statute applicable to it; and that the contract is illegal under this statute as well.

*Sidermar's Cross-Petition to Compel a Consolidated Arbitration*

Sidermar's cross-petition contends, in summary:

(1) The provision in Article 4 excluding Israeli loading ports should not be regarded as a boycott; it may with equal plausibility be regarded as a function of the "safe port" limitation in Article 4, in view of the risk of hostilities in the area.

(2) In any event, the Sidermar/Antco contract does not involve exports from the United States, and the Export Administration Act, together with its declarations of public policy, have no bearing.

(3) The United States has declared its public policy in favor of the enforceability of agreements to arbitrate in international commerce, that declaration taking the form of the 1958 Convention on the Recognition and Enforcement of Foreign Arbitral Awards, ratified by the United States as of December 29, 1970, and implemented by Pub.L. 91–368 of July 31, 1970, 9 U.S.C. §§ 201–208.

Sidermar also moves for an order directing a consolidated arbitration including Nepco as Antco's guarantor. Nepco resists that effort on the theory that (assuming legality of the contract) the terms of its guarantee do not require it to arbitrate with Sidermar.

4. Antco's initial brief at p. 6.

5. Antco's reply brief at p. 19.

*Discussion*

As to the first question, the genesis and purpose of the "excluding Israel" phrase in the contract's designation of loading ports, I am not prepared to make a finding on the papers before me. I decline Antco's invitation to judicially notice that Sidermar inserted the phrase to curry favor with the Arab world. A judicially noticed fact "must be one not subject to reasonable dispute," Rule 201(b), Rules of Evidence for United States Courts; and Sidermar's alternative theory (excluding Israeli ports from the contractual requirement of "safe ports" in view of the political and military tensions of the times) is sufficiently plausible to create a reasonable dispute on the issue. An evidentiary hearing involving the chartering brokers would be necessary to resolve the question.

However, I may assume *arguendo* the truth of Antco's proposition, since the petition to stay arbitration must fail for another reason.

Assuming that Antco has correctly described the derivation of the "excluding Israel" phrase, I hold that its presence and effect in this contract do not offend the public policy of the United States as declared in the Export Administration Act of 1969 and its accompanying regulations. That is because the Sidermar/Antco contract of affreightment does not involve, in any meaningful sense, United States exporters, or exports from the United States. This is a contract between an Italian shipowner and a Bahamian charterer for the ocean carriage of cargoes from Mediterranean ports to Caribbean or, at Antco's option, American ports, in which event the contract would give rise to imports, not exports, in respect of the United States. Antco attempts to endow the contract with a U.S. export flavor by reference to the provision in Article 9 that Sidermar intended to perform the contract "with combined carriers which will load dry cargoes for their own account as back-haul voyage to

Mediterranean." But even if I assume that the eastbound dry cargo voyages were from United States ports (there is no evidence on the point before me), they do not bear so close a relationship to the obligations of the parties before the Court [6] as to bring the export statute into play, or to invalidate the contract in consequence. The only purpose of referring to the back-haul trade in the Sidermar/Antco contract is to explain why Sidermar might not be able to give Antco "exact scheduling" in respect of loading dates in the Mediterranean.

Antco argues that certain phrases in the statute are so broad that they should be regarded as declaring a public policy entirely independent of the export context. It is true that Section 3(5) of the statute, 50 U.S.C.App. § 2402(5), contains phrases that, considered in isolation, would appear to declare a general policy against any "restrictive trade practices or boycotts fostered or imposed by foreign countries against other countries friendly to the United States." However, the *implementation* given by statute and regulations alike to the statute's declarations of policy relate solely to control of exports from the United States. I am not disposed to extend the boundaries of that implementation beyond what the Congress and executive branch themselves have done, particularly where the effect of such an extension would be to deprive parties of bargained-for contractual benefits and remedies.

Furthermore, Sidermar is right in saying that the United States favors arbitration clauses in contracts touching upon international commerce. The nation speaks in different tongues and at different times; cases arise where the determination of "public policy" must be a distillation of several governmental utterances.

In the case at bar, Sidermar points to the manifestation of public policy inherent in adherence by the United States to the United Nations Convention on the Recognition

---

**6.** The shippers and charterers on the back-haul voyages are, of course, strangers to this litigation.

and Enforcement of Foreign Arbitral Awards (the "Convention"). The Convention was considered by the Supreme Court in *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1973), which involved a contract between an American company and a German citizen, and provided for arbitration of disputes in Paris. Alberto-Culver moved to stay arbitration on the ground that Scherk had fraudulently misrepresented trademark rights concerned in the contract, in violation of the Securities Exchange Act of 1934, so that the arbitration clause was unenforceable under the rule of *Wilko v. Swan*, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953).[7] The majority of the Court in *Scherk* distinguished *Wilko* because the contract in *Scherk* "was a truly international agreement." 417 U.S. at p. 515, 94 S.Ct. 2449. Therefore it differed from the contract in *Wilko*, where "there was no question but that the laws of the United States generally, and the federal securities laws in particular, would govern disputes arising out of the stock-purchase agreement." 417 U.S. at p. 515, 94 S.Ct. at p. 2455. The Court, enforcing the arbitration clause in *Scherk*, stated:

"A contractual provision specifying in advance the forum in which disputes shall be litigated and the law to be applied is, therefore, an almost indispensable precondition to achievement of the orderliness and predictability essential to any international business transaction. Furthermore, such a provision obviates the danger that a dispute under the agreement might be submitted to a forum hostile to the interests of one of the parties or unfamiliar with the problem area involved.

"A parochial refusal by the courts of one country to enforce an international arbitration agreement would not only frustrate these purposes, but would invite unseemly and mutually destructive jock-

eying by the parties to secure tactical litigation advantages. . . .

"Whatever recognition the courts of this country might ultimately have granted to the order of the foreign court, the dicey atmosphere of such a legal no-man's-land would surely damage the fabric of international commerce and trade, and imperil the willingness and ability of businessmen to enter into international commercial agreements." 417 U.S. at p. 516, 94 S.Ct. at p. 2455.

While the Court in *Scherk* did not base its decision squarely on the Convention, it drew support from the adherence of the United States to the Convention:

"Our conclusion today is confirmed by international developments and domestic legislation in the area of commercial arbitration subsequent to the Wilko decision. On June 10, 1958, a special conference of the United Nations Economic and Social Council adopted the Convention on the Recognition and Enforcement of Foreign Arbitral Awards. In 1970 the United States acceded to the treaty, [1970] 3 U.S.T. 2517, T.I.A.S. No. 6997, and Congress passed Chapter 2 of the United States Arbitration Act, 9 U.S.C. § 201 et seq., in order to implement the Convention. Section 1 of the new chapter, 9 U.S.C. § 201, provides unequivocally that the Convention 'shall be enforced in United States courts in accordance with this chapter.'

"The goal of the Convention, and the principal purpose underlying American adoption and implementation of it, was to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries. . . .

"Without reaching the issue of whether the Convention, apart from the considera-

---

7. *Wilko* involved a stock purchase agreement between a customer and a brokerage house, both American. The Court held that where the customer alleged false representations by the brokerage house, he was entitled to sue for damages under the Securities Act of 1933, notwithstanding an arbitration clause in the margin agreement.

tions expressed in this opinion, would require of its own force that the agreement to arbitrate be enforced in the present case, we think that this country's adoption and ratification of the Convention and the passage of Chapter 2 of the United States Arbitration Act provide strongly persuasive evidence of congressional policy consistent with the decision we reach today." 417 U.S. at pp. 520–521, n. 15, 94 S.Ct. at pp. 2457–2458.

■ In the case at bar, Sidermar directly invokes the Convention, as implemented by Chapter 2 of the United States Arbitration Act, 9 U.S.C. §§ 201–208. I hold that Sidermar's reliance is well founded. The arbitration agreement in the contract between two foreign corporations falls within the Convention. 9 U.S.C. § 202.[8] This Court has jurisdiction to entertain Sidermar's cross-petition. 9 U.S.C. § 203. Venue is properly laid here, since the arbitration is to take place within the district. 9 U.S.C. § 207. The Court has the power to compel arbitration under 9 U.S.C. § 206:

"A court having jurisdiction under this chapter may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States. Such court may also appoint arbitrators in accordance with the provisions of the agreement."

To be sure, Article II(3) of the Convention provides:

"The court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, *unless it*

finds that the said agreement is null and void, inoperative or incapable of being performed." (emphasis added)

The phrase "null and void" opens the door to an argument for non-enforcement based on illegality; but I construe the phrase to require a showing by the party resisting enforcement of the agreement that the essence of the obligation or remedy is prohibited by a pertinent statute or other declaration of public policy. That is the typical situation in the cases Antco cites.[9] In *Island Territory of Curacao v. Solitron Devices, Inc.,* 489 F.2d 1313, 1320 (2d Cir. 1973), *cert. den.,* 416 U.S. 986, 94 S.Ct. 2389, 40 L.Ed.2d 763, the Second Circuit summarized New York law on the point:

"*In re Kramer & Uchitelle,* 288 N.Y. 467, 43 N.E.2d 493 (1942), heavily relied upon by appellant for the proposition that, at least as a matter of New York law, a proceeding to enforce an arbitration contract presupposes the existence of a valid and enforceable contract at the time the remedy is sought, has been limited, *In re Exercycle Corp.,* 9 N.Y.2d 329, 335–336, 214 N.Y.S.2d 353, 356–358, 174 N.E.2d 463, 465–466 (1961), to the situation in which public policy as embodied in a statute *forbids the performance which is the subject of dispute,* a policy and statute which are as binding upon the arbitrators as upon the courts." (emphasis added)

No such showing is made in the case at bar. The "performance which is the subject of the dispute" is Antco's obligation to furnish cargoes to Sidermar's vessels at Mediterranean (or, at *Antco's* option, Nigerian) ports. Israeli ports are excluded; but assuming *arguendo* that the exclusion in some man-

---

8. Under the terms of its adherence, the United States limits application of the Convention to legal relationships "which are considered as commercial under the national law of the United States." The maritime contract of affreightment in suit is "commercial" under that standard. Cf. 9 U.S.C. § 1; and see *Island Territory of Curacao v. Solitron Devices, Inc.,* 356 F.Supp. 1, 12–13 (S.D.N.Y.1973), *aff'd* on other grounds, 489 F.2d 1313 (2d Cir. 1973), *cert. den.,* 416 U.S. 986, 94 S.Ct. 2389, 40 L.Ed.2d 763.

9. See, *e. g., Matter of Metro Plan, Inc. v. Miscione,* 257 App.Div. 652, 15 N.Y.S.2d 35 (1st Dept. 1939) (arbitration agreement not enforceable if underlying chattel mortgage is usorious); *F.A. Straus & Co., Inc. v. Canadian Pac. R. Co.,* 254 N.Y. 407, 173 N.E. 564 (1930) (bill of lading clause exempting carrier from all liability for negligence not enforceable because directly contrary to New York public policy).

ner contravenes public policy as expressed in the Export Regulation Act, it still falls far short of entirely forbidding Antco's performance under the contract.

A narrow construction of the Convention's "public policy" defense is supported by *Parsons & Whittemore Overseas Co., Inc. v. Societe Generale de L'Industrie du Papier,* 508 F.2d 969 (2d Cir. 1974), in which we find a more recent consideration by the Second Circuit of the Convention. In *Parsons* enforcement was sought in this court of a foreign arbitral award. While the present case involves enforcement of the arbitration agreement rather than enforcement of the award, comparable questions of public policy arise; thus Article V(2)(b) of the Convention allows the court in which enforcement of a foreign arbitral award is sought to refuse enforcement if "enforcement of the award would be contrary to the public policy of [the forum] country." Enforcement of the arbitration award in *Parsons* was resisted on the theory that the public policy of the United States would be offended by enforcement. This court confirmed the award, and the Second Circuit affirmed. After reviewing the purposes and drafting of the Convention, the Second Circuit stated:

> "We conclude, therefore, that the Convention's public policy defense should be construed narrowly. Enforcement of foreign arbitral awards may be denied on this basis only where enforcement would violate the forum state's most basic notions of morality and justice. Cf. 1 Restatement Second of the Conflict of Laws § 117, comment c, at 340 (1971); *Loucks v. Standard Oil Co.,* 224 N.Y. 99, 111, 120 N.E. 198 (1918)." 508 F.2d at p. 974.

This rationale applies with equal force to considerations, within the context of enforcement of the arbitration agreement itself, of whether the contract in question is "null and void" under Article II(3) of the Convention.

Furthermore, in *Parsons* the Second Circuit emphasized that the adherence of the United States to the Convention constitutes, in itself, a significant statement of public policy. The Court stated:

> "To read the public policy defense as a parochial device protective of national political interests would seriously undermine the Convention's utility. This provision was not meant to enshrine the vagaries of international politics under the rubric of 'public policy.' Rather, a circumscribed public policy doctrine was contemplated by the Convention's framers and every indication is that the United States, in acceding to the Convention, meant to subscribe to this supra-national emphasis. Cf. *Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974)." 508 F.2d at p. 974.

The contract in *Parsons,* between an American construction company and an Egyptian company, called for the building of a paper mill in Egypt. The project was funded by the United States State Department, through the A.I.D. program. Before completion of construction, the Egyptian government broke off diplomatic relations with the United States, and ordered all Americans out of Egypt. The State Department instructed the American company to cease performance of the contract, in accordance with the provisions of 22 U.S.C. § 2370(p), (q), (t), which prohibited the furnishing of assistance to the United Arab Republic subsequent to the cessation of diplomatic relations with that country. The American company complied; the Egyptian company demanded arbitration before the International Chamber of Commerce, as provided for in the agreement; and that tribunal held the American company in breach of contract. Against this background, the American company contended in this court that enforcement of the award would contravene United States public policy. The Second Circuit held that the American company's argument erroneously equated "national" policy with United States "public policy"; and concluded:

> "To deny enforcement of this award largely because of the United States' falling out with Egypt in recent years would mean converting a defense intended to be

of narrow scope into a major loophole in the Convention's mechanism for enforcement. We have little hesitation, therefore, in disallowing Overseas' proposed public policy defense." 508 F.2d at p. 974.

■ I conclude that, in the circumstances of this case, enforcement of the arbitration agreement in the Sidermar/Antco contract would not contravene the public policy of the United States.

■ The foregoing analysis is also sufficient to dispose of Antco's reliance upon Section 296 of the New York Executive Law, quoted *supra*. The applicability of that statute to the contract at bar is not sufficiently demonstrated. In any event, to the extent that this state statute may be regarded as applicable to the Sidermar/Antco contract, its declaration of policy must yield to the public policy of the United States, as expressed in the adherence to the Convention on foreign arbitration agreements and awards.

For the foregoing reasons, Sidermar is entitled to enforcement of the arbitration agreement.

The manner of that enforcement, and the proper parties to the arbitration, remain for consideration.

■ Initially, Antco argues that it is not required to arbitrate Sidermar's claim for damages resulting from repudiation of the contract. That is because, Antco says, the arbitration clause appears in the Essovoy form attached to the contract; and the contract provides that the provisions of the Essovoy form "are incorporated in this Contract by reference and shall apply to each voyage." Because a claim for total repudiation of contract does not constitute a dispute arising with respect "to each voyage", the argument concludes, Antco has not agreed to arbitrate such a claim.

I find no merit in this contention. Part II of the Essovoy form contains a number of basic commercial, charter party provisions, which are significant in determining the rights and obligations of the parties (deadfreight, laydays, demurrage provisions, safe berth provisions, and the like). The obvious intent of the parties was to render such operating provisions, contained in a form which originally contemplated a single voyage, applicable to a series of voyages to be performed pursuant to a long-term contract of affreightment. It would distort the contract to limit the arbitration clause to disputes arising out of a single voyage, thereby denying Sidermar its bargained-for procedural remedies in the event of a total repudiation by Antco. The arbitration clause in the attached Essovoy form is cast in broad terms, referring to "any and all differences and disputes of whatsoever nature arising out of this Charter . . ." That arbitration clause is effectively incorporated by the contract's provision that "if arbitration becomes necessary under Clause 24 of Essovoy (1969) such arbitration shall be held in New York, New York." The broad language of the arbitration clause is inconsistent with Antco's effort to exclude from its coverage a claim for damages resulting from wrongful repudiation of contract.

■ The remaining question is whether Nepco, as guarantor of Antco, is obligated to participate in the arbitration. I hold that it must do so.

The question turns upon the proper construction of the Nepco guarantee, viewed in the light of the Second Circuit's recent decision in *Compania Espanola de Petroleos, S.A. v. Nereus Shipping, S.A.,* 527 F.2d 966 (2d Cir. 1975). Just as in the case at bar, the contract in *Nereus* consisted of a maritime contract of affreightment, calling for the transportation of a specified tonnage of petroleum products, over a term of years. Attached to the contract was the same printed Essovoy form which appears in the present case, with an identical arbitration clause. The charterer was a company called Hideca. Hideca's obligations under the contract were guaranteed by a company called Cepsa. The guarantee given by Cepsa provided as follows:

". . . [W]e, Compania Espanola de Petroleos, S.A., hereby agree that, should HIDECA default in payment or performance of its obligations under the Charter Party, we will perform the balance of the contract and assume the rights and obligations of HIDECA on the same terms and conditions as contained in the Charter Party." 527 F.2d at pp. 969–970.

Judge Stewart held for this court that the language of this guarantee was sufficient to incorporate the contract's arbitration clause; and that Cepsa was accordingly obligated to arbitrate, together with Hideca, the claims which the other party to the contract asserted against both of them. The Second Circuit affirmed, stating in part:

"The guaranty states unequivocally that in the case of Hideca's default, Cepsa is to 'assume the rights and obligations of HIDECA on the same terms and conditions as contained in the Charter Party,' as well as 'perform the balance of the contract.' Although the guaranty does not explicitly restate the specific obligations which Hideca had undertaken and which Cepsa was to assume in the event of Hideca's default, the court found such iteration to be unnecessary in view of the broad language of the guaranty."

\*   \*   \*   \*   \*   \*

"Here, under the guaranty, Cepsa agreed both to 'perform the balance of the contract' and to 'assume the rights and obligations of HIDECA.' Thus, the court's holding in Taiwan that 'performance' could not include the obligation to arbitrate does not dictate our disposition here where additional obligations were expressly undertaken. We agree with Judge Stewart that the duty to arbitrate was indeed one of the rights and obligations under the contract which Cepsa, as guarantor, agreed to assume. See *Midland Tar Distilleries, Inc. v. M/T LOTOS,* 362 F.Supp. 1311 (S.D.N.Y.1973)." 527 F.Supp. at pp. 973–74.

In the last-quoted language, the Second Circuit distinguished *Taiwan Navigation Co. v. Seven Seas Merchants Corp.,* 172 F.Supp. 721 (S.D.N.Y.1959). In that case, the arbitration clause in the charter party referred only to disputes arising "between Owners and the Charterers"; the guarantee consisted of an additional clause to the charter party, which provided in its entirety:

"It is understood that Kervin Shipping Corporation will guarantee perform [sic] of Seven Seas Merchants Corporation under this Charter Party."

This court in *Taiwan* held that, on this language, the arbitration of disputes was not part of the "performance" of the charter as contemplated by the parties and guaranteed by Kervin.

As noted above, the Second Circuit distinguished *Taiwan* in *Nereus* because in the latter case, the guarantor undertook broader obligations. In construing the scope of the guarantee in *Nereus,* the Second Circuit also said:

"We are aided in our construction of the language here by prior decisions which make clear that where an arbitration clause is applicable by its own terms to all disputes and is not limited to those arising between the Owner and Charterer, the agreement to arbitrate binds 'not only the original parties, but also all those who subsequently consent to be bound by [the terms of the contract].'" (cases cited) 527 F.2d at p. 973.

I conclude that the language of the guarantee in the case at bar more closely resembles the guarantee in *Nereus* than the guarantee in *Taiwan.* If there is a substantive difference between the guarantee language in *Nereus,* which was enforced against the guarantor, and the guarantee language in the case at bar, it requires a keener judicial eye than mine to perceive it.

Antco says that the decisive difference between the guarantee in the case at bar and the guarantee in *Nereus* lies in the omission, from the former guarantee, of the word "assume". As noted above, in the case at bar Nepco guaranteed "to fulfill and perform any and all legal obligations that

Antco may be liable for as Charterers under said Contract of Affreightment." At the argument on the motion, counsel for Antco/Nepco conceded that if the phrase read "fulfill, perform and assume any and all legal obligations", Nepco would be bound by the arbitration clause. Antco argues that in the absence of the word "assume", the guarantee in the case at bar should be read as nothing more than a guarantee of performance, and accordingly insufficient to bind Nepco to the arbitration agreement.

I hold that Antco's argument asks a single word to assume far too heavy a burden of significance. To be sure, the Second Circuit in *Nereus* referred to the fact that the word "assume" appeared in the guarantee in that case, but I do not regard the presence or absence of that particular word as crucial to the decision. Each case must turn upon the fair construction of the language used by the parties in its entirety. The Second Circuit distinguished *Taiwan* because (1) the arbitration clause in that charter was limited to disputes between "Owners and Charterers"; and (2) the guarantee was limited strictly to "performance". In the case at bar (as in *Nereus*), the arbitration clause covers "any and all differences and disputes of whatsoever nature arising out of this charter"; and the parties went to the effort of expanding the guarantee so as to include "any and all legal obligations that Antco may be liable for as Charterers . . ."

I hold that the language employed in the contract and guarantee in the case at bar is legally indistinguishable from that in *Nereus;* and that Nepco, as guarantor, is obligated to participate in the arbitration.

*The Composition of the Arbitration Panel*

In *Nereus,* this court directed that the arbitration proceedings involving the shipowner, charterer and charterer's guarantor be consolidated before a single panel of arbitrators. That direction was affirmed by the Second Circuit, and I direct a similar consolidation in the case at bar.

With regard to the composition of the panel, the Second Circuit directed that the disputes be heard by a five-man panel of arbitrators, one selected by each of the three parties, and the two remaining arbitrators to be appointed by the unanimous action of the three arbitrators appointed by the parties.[10] The Court of Appeals was of the view that "it is important that each party have its own representative," 527 F.2d at p. 975. The order that I am entering with this opinion provides for the same sort of panel and method of selection, unless the parties agree to a different arrangement. Specifically, Antco and Nepco may see no need for separate representation, and agree to the appointment of a single arbitrator to represent their joint interests. If Antco and Nepco so agree, and Sidermar makes no objection, then a panel of three arbitrators will hear the disputes, at some possible saving in expense and increase in convenience. If the parties fail to so agree, the panel will be selected in accordance with the *Nereus* formula.

*Conclusion*

For the reasons stated, Antco's petition to stay arbitration is denied; Sidermar's cross-petition to compel a consolidated arbitration with Antco and Nepco is granted; and further proceedings will be governed by the terms of the order which the court is entering with this opinion.

---

**10.** The arbitrator-selection machinery specified in *Nereus* provides that, in the event of a failure to fill any vacancy in the arbitration panel, the appointment will be made by the district court. A comparable provision appears in the order which will be entered in the case at bar.