**O & Y LANDMARK ASSOCIATES OF VIRGINIA, Petitioner,**

**v.**

**Scott NORDHEIMER, Gary Nordheimer, and Myer Feldman, Respondents.**

**Civ. A. No. 89–2557.**

United States District Court, District of Columbia.

Nov. 16, 1989.

David J. Branson, Kaye, Scholer, Fierman, Hays & Handler, Washington, D.C., for petitioner.

Burton A. Schwalb, Schwalb, Donnenfeld, Bray & Silbert, P.C., Washington, D.C., for respondents.

## MEMORANDUM

FLANNERY, District Judge.

In this matter, O & Y Landmark Associates of Virginia, a New York general partnership, petitions the court to compel three individuals to join an arbitration proceeding between petitioner and NF Associates, a District of Columbia general partnership.[1] The three respondents, Scott Nordheimer, Gary Nordheimer, and Myer Feldman, have guaranteed NF Associates' performance of its obligations under a joint venture agreement with O & Y Landmark.[2] For their part, respondents have moved to dismiss the petition or to stay its consideration. For the reasons stated below, the court will

---

1. Petitioner asserts this court has jurisdiction under Section 4 of the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.,* and diversity of citizenship, 28 U.S.C. §§ 1332(a), 1332(c). Pet'n at 2. The Supreme Court has stated, however, that the arbitration act "does not create any independent federal-question jurisdiction under 28 U.S.C. § 1331 (1976 ed. Supp. V) or otherwise. Section 4 provides for an order compelling arbitration only when the federal district court would have jurisdiction over a suit on the underlying dispute; hence, there must be diversity of citizenship or some other independent basis for federal jurisdiction before the order can issue." *Moses H. Cone Memorial Hosp. v. Mercury Const.,* 460 U.S. 1, 25 n. 32, 103 S.Ct. 927, 942 n. 32, 74 L.Ed.2d 765 (1983); *cf., Bangor and Aroostock R.R. Co. v. Maine Cent. R.R Co.,* 359 F.Supp. 261, 262–63 (D.D.C.1973).

On the issue of diversity, petitioner O & Y Landmark Associates of Virginia states it is a New York general partnership, consisting of a Delaware corporation whose principal place of business is in New York, and a Virginia corporation with its principal place of business in New York. *Id.* The parties agree that respondent Gary Nordheimer resides in Maryland. *Id.;* Resp. at 1. Respondents deny petitioner's averment that Scott Nordheimer lives in Washington, D.C., and that Feldman resides in Florida, but respondents have not contested diversity jurisdiction. *Id.* The petition does not state the amount involved in the pending arbitration, but respondents suggest it could be as much as $60 million. Respt's. Mem. in Opp. at 4. It thus appears that the requirements of diversity jurisdiction are met.

2. The respondents are also general partners in NF Associates.

grant O & Y's petition and deny respondents' motion.

## I

This court's authority to grant the petition is based upon Section 4 of the Federal Arbitration Act, 9 U.S.C. § 4, which provides:

§ 4. Failure to arbitrate under agreement; petition to United States District Court having jurisdiction for order to compel arbitration; notice and service thereof; hearing and determination

A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court ... for an order directing that such arbitration proceed in the manner provided for in such agreement....

While the facts alleged by the parties have a byzantine[3] quality, the major substantive legal issue before the court seems fairly straightforward: In personally guaranteeing NF Associates' performance, did respondents in their individual capacities enter into an agreement to arbitrate?[4]

In this regard, it is undisputed that on or about December 31, 1980, petitioner and NF Associates entered into an Amended and Restated Agreement of Joint Venture of Woodlake Associates (Woodlake Joint Venture Agreement). The agreement has the following provision: "Section 10.3. *Arbitration....* [A]ny controversy or claim arising out of or relating to this Agreement shall be settled by arbitration...."

Both parties also agree that at about the same time as NF Associates entered into the Woodlake Joint Venture Agreement, the three respondents executed a personal guaranty that they would:

"jointly and severally, hereby undertake and guarantee that [NF Associates], or [respondents] for it, will fully and faithfully perform all the obligations of the Agreement on [NF Associates'] part to be kept and performed."

The guaranty contains no arbitration provision.

## II

Respondents oppose the petition on technical, substantive, and "equitable" grounds. The court believes that none overcomes O & Y Landmark's right to have its petition granted.

---

**3.** To summarize the history of the many conflicting claims and counterclaims in this matter, it appears that the petition grows out of dealings between: a) respondents, their NF Associates general partnership, and other entities they control, all referred to below as "NF;" and, b) entities said to be controlled by an Alfred Reichman, referred to below as "O & Y." According to the pleadings, in 1980, the principals behind NF and O & Y entered into a master agreement to pursue jointly a number of land development schemes. It appears that NF and O & Y put together 12 developments, each carried out by a separate joint venture, each consisting of one NF entity and one O & Y entity. It further appears that the joint venture agreements provide for arbitration to settle disputes between the constituent NF and O & Y parts, but that the master agreement does not.

The parties agree that one of the 12 ventures is Woodlake Associates, which consists of NF Associates and O & Y Landmark Associates of Virginia, the petitioner here. According to respondents, at some point in 1987 or 1988, O & Y and NF began to disagree over how best to pursue the Woodlake venture, as well as the rest of the other developments. In September 1988, petitioner avers it demanded arbitration against NF Associates and respondents under the Woodlake Joint Venture agreement. From the pleadings, it seems that the arbitration includes issues from five of the 12 joint venture developments. Although NF Associates proceeded with that arbitration, respondents declined to participate personally.

In their opposition to the petition, respondents allege that O & Y breached the master agreement governing all the joint ventures. As a result, the Nordheimers, Feldman, and some of their NF entities have filed a civil action against a number of O & Y entities in the Superior Court of the District of Columbia. NF apparently would prefer to have the differences with O & Y resolved in that action rather than through the Woodlake arbitration. In addition to the arbitration and this petition, at least one other O & Y entity is said to have brought a related case in Virginia.

**4.** Petitioner also argues that as general partners in NF Associates, the Nordheimers and Feldman personally are parties to the agreement to arbitrate. Because the court believes that the respondents' position as guarantor is sufficient ground for granting the petition, it does not rule on this second issue.

## A.

■ Respondents first argue that Federal Rule of Civil Procedure 17(b), captioned "Capacity to Sue or be Sued," prevents O & Y Landmark from bringing this petition before the court.[5] The rule dictates that as a partnership, petitioner's "capacity to sue or be sued shall be determined by the law of the state in which the district court is held," Fed.R.Civ.P. 17(b). Respondents' view is that because the law of the District of Columbia does not permit a partnership to bring an action in its own name, O & Y Landmark's petition is fatally defective and should be dismissed. Respt's Mem. in Opp. at 9. Respondents cite two cases for this: *Affie, Inc. v. Nurel Enterprises, Inc.*, 607 F.Supp. 220, 221 (D.D.C.1984), and *Day v. Avery*, 548 F.2d 1018, 1022 (D.C.Cir.1976), *cert. denied*, 431 U.S. 908, 97 S.Ct. 1706, 52 L.Ed.2d 394 (1977).

This argument is correct as far as it goes. But, as O & Y Landmark points out, Rule 17(b) goes farther. After the language quoted above, the rule adds a critical qualification: *"except* (1) that a partnership or other unincorporated association, which has no such capacity by the law of such state, may sue or be sued in its common name for the purpose of enforcing for or against it a substantive right existing under the Constitution or laws of the United States...." (Emphasis added.)

The court has previously quoted *Moses H. Cone Memorial Hosp. v. Mercury Const.*, 460 U.S. 1, 25 n. 32, 103 S.Ct. 927, 942 n. 32, 74 L.Ed.2d 765 (1983): "The Arbitration Act is something of an anomaly in the field of federal-court jurisdiction. *It creates a body of substantive federal law establishing and regulating the duty to*

*honor an agreement to arbitrate*, yet it does not create any independent federal-question jurisdiction under 28 U.S.C. § 1331 (1976 ed. Supp. V) or otherwise." (Emphasis added.)

Additionally, one of respondents' own cases undermines their argument. The *Day* court stated that Rule 17(b)'s term "'substantive rights' has been interpreted to embrace every manner of claim for relief—whether constitutional ... [or] statutory, *e.g., Petrol Shipping Corp. v. Kingdom of Greece*, 2 Cir. 360 F.2d 103, cert. denied, 385 U.S. 931 [87 S.Ct. 291, 17 L.Ed.2d 213 (1966)] ... (suit to compel arbitration under Federal Arbitration Act)." *Day*, 548 F.2d at 1022 n. 11. Thus, this circuit specifically recognizes that Section 4 of the Federal Arbitration Act creates a substantive federal right for purposes of Rule 17(b)(1). On this authority, the court rules that O & Y Landmark may bring this petition in its own name. Respondents' first objection fails.

## B.

■ Respondents' second and substantive objection to the petition also is unavailing. The Nordheimers and Feldman contend that they have never entered in a personal capacity into a "written agreement for arbitration." Respondents argue that unless they have, they may not be compelled to arbitrate under 9 U.S.C. § 4. According to respondents, the only agreement they have entered into in an individual capacity is the guaranty of NF Associates' performance of the Woodlake Joint Venture. That guaranty having no arbitration clause, respondents contend that there is no written agreement to arbitrate[6] to

---

5. Rule 17(b) states: (b) Capacity to Sue or be Sued. The capacity of an individual, other than one acting in a representative capacity, to sue or be sued shall be determined by the law of the individual's domicile. The capacity of a corporation to sue or be sued shall be determined by the law under which it was organized. In all other cases capacity to sue or be sued shall be determined by the law of the state in which the district court is held, except (1) that a partnership or other unincorporated association, which has no such capacity under the law of such state, may sue or be sued in its common name for the purpose of enforcing for or against it a

substantive right existing under the Constitution or laws of the United States....

6. Respondents did sign the Woodlake Joint Venture Agreement, which has an arbitration clause. O & Y Landmark recognizes that respondents entered the agreement not in an individual capacity, but in the role of general partners signing for the NF Associates partnership. O & Y Landmark also argues, however, that as general partners, respondents must be held to have agreed to arbitrate personally when their partnership entered into the Woodlake Joint Venture agreement containing an arbitration

serve as the basis for compelling them as individuals to participate in the arbitration.

In response, petitioner contends that the guaranty itself may be read as an agreement to arbitrate. In support, O & Y Landmark cites: *Compania Espanola de Petroleos, S.A. v. Nereus Shipping, S.A.,* 527 F.2d 966 (2d Cir.1975), *cert. denied,* 426 U.S. 936, 96 S.Ct. 2650, 49 L.Ed.2d 387 (1976), and *Antco Shipping Co., Ltd. v. Sidermar S. p. A.,* 417 F.Supp. 207 (S.D.N. Y.1976).

Both cases dealt with shipping contracts containing arbitration clauses. In both instances, a third party had executed a written guaranty for the performance of one of the contracting parties. Although neither guaranty contained a specific clause agreeing to arbitrate, both courts held that the guaranty bound the guarantor to fulfil the agreement to arbitrate written into the underlying contract. In essence, the two courts viewed the guaranty as incorporating the contract's agreement to arbitrate. The *Nereus* court felt that "although the guaranty does not explicitly restate the specific obligations" of the underlying contract whose performance had been guaranteed, "such iteration [is] unnecessary in view of the broad language of the guaranty." *Nereus,* 527 F.2d at 973.

In *Nereus,* the guarantor undertook that upon the guaranteed party's "default in payment or performance of its obligations under the [contract], we will perform the balance of the contract and assume the rights and obligations of [the guaranteed party] on the same terms and conditions as contained in the [contract]." *Id.* at 969–70. The *Nereus* court stated that:

"whether a guarantor is bound by an arbitration clause contained in the original contract necessarily turns on the language chosen by the parties in the guaranty. We are aided in our construction of the language here by prior decisions which make clear that where an arbitration clause is applicable by its own terms to all disputes and is not limited to those arising between the [the original parties to the underlying contract], the agreement to arbitrate binds 'not only the original parties, but also all those who subsequently consent to be bound by the terms of the contract.'"

*Id.* at 973. (Citations omitted.).

In compelling the guarantor to arbitrate, the *Nereus* court pointed to language binding the guarantor to "perform the balance of the contract" and "assume the rights and obligations" of the guaranteed party. *Id.* at 973–74.[7]

In *Antco,* the guaranty provided: "In the event that Antco fails to perform its duties and obligations ... under the [c]ontract ..., then [the guarantor] hereby guarantees to fulfill and perform any and all legal obligations that Antco may be liable for" under the contract. *Antco,* 417 F.Supp. at 210–11.

Citing *Nereus,* the *Antco* court also held that the guarantor had to participate in the arbitration. *Id.* at 218–19. The District Judge in *Antco* rejected the argument that *Nereus* turned on the guarantor's agreement "to assume" the obligations and rights of the guaranteed party. "I do not regard the presence or absence of that particular word as crucial to the decision. Each case must turn upon the fair construction of the language used by the parties in its entirety." *Id.* at 219. In particular, the *Antco* court stressed that the "parties went to the effort of expanding the guaranty so as to include 'any and all legal obligations that Antco may be liable for'" as a contracting party. *Id.*

This court finds these two cases persuasive and holds that the language of

---

clause. As noted above and discussed further below, the court does not deem it necessary to decide this issue, given its ruling on the guarantor issue.

7. The *Nereus* court distinguished a case in which the guarantor was not compelled to arbitrate, stating that the underlying contract contained only a narrow arbitration clause "expressly applicable only to disputes" between the contracting parties. 527 F.2d at 973–74. In distinguishing a second case, the *Nereus* court stated that arbitration had not been compelled because the guarantor had merely agreed to "guarantee performance," whereas the language of the guaranty in *Nereus* indicated that "additional obligations were expressly undertaken." *Id.*

respondents' guaranty here must be given the same effect as in *Nereus* and *Antco*. The arbitration clause here, "any controversy or claim arising out of or relating to this Agreement shall be settled by arbitration" is just as broad as that in both *Nereus* and *Antco:* "Any and all differences and disputes of whatsoever nature arising out of this [contract] shall be put to arbitration...." Similarly, there is no practical legal distinction between the language of any of the guaranties. In particular, the guaranty here includes the words that NF Associates, *"or the undersigned for it,* will fully and faithfully perform *all of the obligations"* that NF associates agreed would be "kept and performed." (Emphasis added.) In the words of the *Antco* court, "if there is a substantial difference" among the language of the various guaranties, "it requires a keener judicial eye than mine to perceive it." *Antco,* 417 F.Supp. at 218.

Respondents cite only one arguably relevant case [8] to support their view that guarantors may not be compelled to arbitrate if the guaranty has no arbitration clause, *Buy–Rite Costume Jewelry, Inc. v. Albin,* 676 F.Supp. 433 (D.R.I.1988).[9]

This court does not find *Buy–Rite* applicable. First, the opinion does not quote the language of the guaranty at issue, so it cannot be compared to those cited above. To the extent that we are informed about the guaranty, it appears that the guaranteed performance only encompassed making good on installment payments due in the bulk sale of a costume jewelry company. *Id.* at 424. Whether the guaranty included the sort of expanded obligations discussed in *Nereus, Antco,* and here is unclear. As this court has noted, the language of the respondents' guaranty concerning such obligations is among the decisive points in this case.

Second, this case arises under a different section of the Federal Arbitration Act and is in an entirely different posture than *Buy–Rite.* In *Buy–Rite,* there was no arbitration proceeding pending, and the defendant seeking the stay had waived his right to compel arbitration by pursuing a state action instead. *Id.* at 435. Thus, few, if any, of the considerations that commended themselves to the *Buy–Rite* court confront this court.

Third, *Nereus* is the considered view of an appeals court having significant experience with large, complex arbitration issues. *Antco* was decided by a district court with

---

**8.** In their memorandum in support of the motion to dismiss or stay and at oral argument, respondents cite *Al–Haddad Bros. Enterprises, Inc. v. M.S. Agapi,* 551 F.Supp. 956 (D.Del.1982) for the proposition "guarantor not required to arbitrate." Respt's Mem. in Opp. at 13. As petitioner points out, and so far as this court can tell, *Al–Haddad* involves a stevedore, not a guarantor. Otherwise, none of the rest of respondents' cases involves a guarantor. As respondents concede the cases "all stand for the proposition that one who has not agreed to arbitrate cannot be compelled to do so." Respt's Reply at 4. Because the court has decided that the Nordheimers and Feldman did agree to arbitrate, these cases do not help respondents.

Respondents also ask the court to be guided by analogy to *Washington Metro. Area Transit Auth. v. NORAIR Eng'g Corp.,* 553 F.2d 233 (D.C.Cir.1977), because there is no case in this circuit directly addressing whether a guarantor in respondents' situation may be compelled to arbitrate. *NORAIR* deals with a civil action brought by a prime contractor against a subcontractor. *Id.* at 234. The prime contract provided that disputes between the parties to the prime contract would be resolved through an administrative process involving first one party's contracting officer and then the U.S. Army Corps of Engineers Board of Contract Appeals. *Id.* The sub-contract contained no such provision. Nevertheless, the sub-contractor moved to dismiss or stay the civil action pending resolution of the dispute through the administrative process provided in the prime contract. The *NORAIR* court affirmed a denial of the motion to dismiss or stay. *Id.* at 234–35. This court prefers to be guided by precedent from another circuit that is on point rather than a dubious analogy to a ruling from this circuit.

**9.** In *Buy–Rite,* the court denied defendant's motion to stay a federal civil action pending arbitration under Section 3 of the Federal Arbitration Act, 9 U.S.C. § 3. *Id.* at 424. Plaintiff brought the action to rescind a guaranty, and defendant based its motion to stay on the premise that the dispute was governed by a written arbitration agreement. *Id.* The *Buy–Rite* court held that the dispute was not referable to arbitration because plaintiff's guaranty contained no arbitration clause, and plaintiff had not entered into certain underlying agreements between defendant and a third party that were the subject of the guaranty. *Id.* at 435.

a great deal of background in commercial arbitration. This court finds these two cases more relevant to the issues facing it. Respondents' cases do not overcome the law favoring petitioner.[10]

Based upon the foregoing, the court decides that respondents did agree to arbitrate personally and may be compelled to join the arbitration in their individual capacities.[11]

## C.

Respondents' final argument is an appeal to the court to exercise its "equitable discretion" to dismiss this petition or to stay it pending the outcome of a civil action respondents have brought in the District of Columbia Superior Court.[12] Respt's Mem. in Opp. at 17. This, too, fails.

Respondents fear that if this court compels them to join the Woodlake arbitration, the larger interests behind O & Y Landmark will be able to "fragment the resolution of disputes arising out of the [dozen] joint ventures, [and] respondents will be severely hampered, if not barred, from presenting any set-offs and counterclaims flowing from the admitted use by certain ventures of funds belonging to other ventures." *Id.* at 19. Respondents add:

10. At oral argument, respondents' contended that the Nordheimers and Feldman have fully lived up to their guaranty because they ensured that NF Associates performed its undertaking to arbitrate any dispute with O & Y Landmark. Thus, respondents seem to suggest that there is no reason, or perhaps no need, to compel the three individuals to join the arbitration, presumably because either (1) respondents have not breached their guaranty or (2) respondents will see that NF Associates honors any arbitral award against it just as they ensured that it honored the duty to arbitrate. This argument cannot withstand full scrutiny.

First, respondents' duty to arbitrate personally does not arise from a breach of the guaranty. Respondents' duty is grounded in their agreement in the guaranty to do themselves what NF Associates contracted to do when it entered into the Woodlake Joint Venture. That is, to arbitrate "any controversy or claim arising out of or relating to this Agreement ..." NF Associates need not be found in default of either the agreement's substantive terms or the arbitration clause in order for respondents' individual duty to arbitrate to become enforceable. A close reading of *Nereus* and *Antco* indicates that their holdings depend upon the view that the guarantor's duty to arbitrate is co-extensive with that of the guaranteed party; therefore, as soon as the guaranteed party may be compelled to arbitrate, the guarantor may be as well. *Cf.* the *Nereus* court's view that the guarantor may be compelled to arbitrate before it is conclusively determined that the guaranteed party defaulted. *Nereus*, 527 F.2d at 974.

Second, even complete certainty, rather than mere inference, that respondents will see to it that NF Associates honors any award in arbitration would have nothing to do with whether to compel respondents to participate in the arbitration. The court assumes that all parties will live up to their contractual obligations. But, if respondents were not joined in this arbitration, and if NF Associates could not, or would not, honor an arbitral award, then petitioner would have to litigate fully another civil action against

respondents as partners. This is just precisely what the arbitration act is designed to avoid. Having decided that respondents entered an agreement to arbitrate, this court must compel them to participate in the arbitration. *See Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 218, 105 S.Ct. 1238, 1241, 84 L.Ed.2d 158 (1985) (Arbitration Act leaves no discretion to district court, but mandates that it *shall* direct parties to proceed to arbitration on issues subject to agreement to arbitrate) (emphasis in original); *Conticommodity Services v. Philipp & Lion,* 613 F.2d 1222, 1224–25 (2d Cir.1980) (unless making of agreement or refusal to arbitrate disputed, court must compel arbitration).

11. The court sees no reason to decide the question whether respondents also agreed to arbitrate individually when they signed the Woodlake Joint Venture agreement on behalf of NF Associates in their capacities as general partners. In support of this view, O & Y states that the agreement specifically incorporates the Uniform Partnership Act as enacted into law in Virginia. Petitioner adds that § 15 of the act makes a partner jointly liable for "debts and obligations of the partnership," citing Va.Code Ann. § 50–15(b). To complete the logic, petitioner cites: (1) a Virginia case, *Burruss v. Green Auction & Realty Co.,* 228 Va. 6, 319 S.E.2d 725 (1984), for the proposition that the relationships and duties among joint venturers are essentially the same as those among partners; and, (2) a federal case deciding Maine state law, *Hartford Financial Systems v. Florida Software Services,* 550 F.Supp. 1079, 1087–88 (D.Me.1982), *appeal dismissed,* 712 F.2d 724 (1st Cir.1983), for the proposition that when a partnership enters into an agreement providing for arbitration, the individual liability of partners becomes arbitrable as well. Sitting in the District of Columbia, this court is loath to foray, without compelling need, into either Maine or Virginia state law.

12. See the footnote No. 3 above.

"Staying this action in deference to the Superior Court proceeding, in which all interested parties are joined and all issues can be resolved, will not only conserve judicial resources, it will also conserve the parties' resources. Respondents position is simply not akin to petitioner's when it comes to financing the multiplicity of proceedings that will flow from Petitioner's decision not to consolidate disputes as to all twelve entities into one arbitration, but to proceed in a piecemeal fashion."

*Id.* at 18–19.

In essence, respondents suggest that this petition is but a small skirmish in just one battle in a larger war. They ask the court to order a cease-fire in the skirmish so that respondents and their allies can marshall their forces and engage petitioner and its confederates in a legal Armageddon.

To bolster their resort to the court's equitable discretion, respondents cite *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). Respondents assert that in *Colorado River* the "Supreme Court outlined the factors to be considered in determining whether a federal court should defer to concurrent state court proceedings." Respt's Mem. in Opp. at 17. According to respondents, chief among these factors is the avoidance of piecemeal litigation. *Id.* at 18. Respondents contend that the *Colorado River* factors "have been found" applicable to a petition to compel arbitration, citing *Moses H. Cone Memorial Hosp. v. Mercury Const.*, 460 U.S. 1, 13, 103 S.Ct. 927, 935, 74 L.Ed.2d 765 (1983).

Here again, respondents are impaled on their own case. In the first place, the Supreme Court in *Cone* did exactly the opposite of what respondents urge this court to do. Instead, the Supreme Court affirmed a federal circuit court's decision to: (1) reverse a stay of a petition to compel arbitration; and, (2) enter an order to arbitrate. *Id.* at 29, 103 S.Ct. at 943.

Second, while acknowledging that the danger of piecemeal litigation "was paramount" in *Colorado River*, the *Cone* court stated "[t]here is no force to [that] consideration" in an arbitration case. The court added:

It is true, therefore, that if [one party] obtains an arbitration order for its dispute, [the other party] will be forced to resolve these related disputes in different forums. This misfortune, however, is not the result of any choice between the federal and state courts; it occurs because the relevant federal law *requires* piecemeal litigation to give effect to an arbitration agreement. Under the Arbitration Act, an arbitration agreement must be enforced notwithstanding the presence of other persons who are parties to the underlying dispute but not to the arbitration agreement.

*Id.* at 20, 103 S.Ct. at 939. (Emphasis in original; footnotes omitted).

Third, the *Cone* court also made clear that avoidance of piecemeal litigation was the paramount factor in *Colorado River* only because "the primary policy of the statute" at issue, the McCarran Amendment, 43 U.S.C. § 633, "was the *avoidance* of piecemeal litigation." *Cone* at 20 n. 22, 103 S.Ct. at 939 n. 22. (Emphasis in original.) *Cone* states this is not so with arbitration.[13]

**13.** *See also Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 220, 105 S.Ct. 1238, 1242, 84 L.Ed.2d 158 (1975). The Supreme Court overturned the denial of a motion to compel arbitration. *Id.* at 223–24, 105 S.Ct. at 1243–44. Respondent Byrd had brought an action against his stockbroker alleging violation of federal securities laws and state law provisions. *Id.* at 214, 105 S.Ct. at 1239. The stockbroker petitioned the court to sever the state claims and compel arbitration, which was provided for in a Customer's Agreement between the broker and Byrd. *Id.* at 215, 105 S.Ct. at 1239. The district court denied the petition, in part to avoid redundant litigation. In reversing, the Supreme Court stated:

[T]he Arbitration Act requires district courts to compel arbitration of pendent arbitrable claims when one of the parties files a motion to compel, even where the result would be the possibly inefficient maintenance of separate proceedings in different forums.... The preeminent concern of Congress in passing the Act was to enforce private agreements into which private parties had entered, and that concern requires that we rigorously enforce

Fourth, the other *Colorado River* factors give this court no more reason to defer arbitration until resolution of the Superior Court action than they did the Supreme Court in *Cone.* First, neither this court nor Superior Court has jurisdiction over any *res* or property. *Id.* at 19, 103 S.Ct. at 938. Second, whether resolved in Superior Court or in arbitration, the decision will be made in the District of Columbia, so no forum is more convenient to one party than the other. *Id.* Last, O & Y Landmark actually filed this petition a day before respondents and their entities brought the Superior Court action. To the extent that the first forum to obtain jurisdiction plays a role in deciding whether this court should defer to the state court, this factor cuts in favor of petitioner, not respondents. *Id.* at 21, 103 S.Ct. at 939. *Cone* suggests that winning a race to the courthouse is not the criterion for decision.[14] Instead, this factor should be gauged by how much progress has been made in the two actions. *Id.* at 21–22, 103 S.Ct. at 939–40. This court is about to make a final decision; the same cannot be said for Superior Court.

Ultimately, for this court to defer to Superior Court would fly in the face of what the *Cone* court called "Congress' clear intent in the Arbitration Act, to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible." *Id.* at 22, 103 S.Ct. at 940. A dismissal or stay here would frustrate "the statutory policy of rapid and unobstructed enforcement of arbitration agreements." *Id.* at 23, 103 S.Ct. at 941. The law stated in *Cone* compels this court to deny respondents motion to dismiss or stay.

As a last consideration, not only is the law against respondents, but the equities are too. Respondents came surprisingly late to their discovery that only the Superior Court can deliver the full measure of justice that they now think the galaxy of disputes in this matter demands. Indeed, some twelve months elapsed between the petitioner's call for arbitration and respondents' recognition that the alleged breach of the master agreement dictated bringing an action in Superior Court. During this time, it appears that respondents were quite willing to arbitrate so long the arbitration took up issues relating to all twelve joint ventures. Respt's Mem. in Opp. at 6–7. Respondents must have known that a consolidated arbitration cannot repair the alleged breach of the master agreement and so cannot provide the one, comprehensive resolution of all disputes that respondents now claim to need. Even now, if respondents fear multiple, expensive arbitrations with inconsistent outcomes and loss of set-offs and counterclaims, they have an obvious course open to them. It appears to the court that it is not so much equity being argued here, but strategy. This court can no more be guided in its decision by respondents' desire that a massive battle determine the outcome of the war than it can by petitioner's alleged preference for a campaign of skirmish and attrition.

In short, the court holds that the law does not permit it to dismiss or stay the petition, and the equities do not warrant it.

### III

In conclusion, the court holds that: (a) O & Y Landmark may bring this petition in its own name; (b) respondents agreed in their personal capacities to arbitrate disputes under the Woodlake Joint Venture Agreement when they guaranteed NF As-

---

agreements to arbitrate, even if the result is 'piecemeal' litigation, at least absent a countervailing policy manifested in another federal statute.
*Id.* at 217, 221, 105 S.Ct. at 1240, 1242.

**14.** To some extent, the party seeking to avoid arbitration can almost always win the race to courthouse because, in effect, it holds the starter's gun. A petitioner risks a false start if it leaves the blocks before the other party has actually refused to arbitrate. The party opposing arbitration can usually delay communicating its refusal until after it has filed an alternative action. *See* the discussion in *Cone,* 460 U.S. at 21–22, 103 S.Ct. at 939–40. Petitioner here states it first demanded arbitration in September 1988. Considerable wrangling over the scope of the arbitration seems to have ensued during the next year. Thus it was not until mid-September of 1989 that both parties repaired to their respective courts of choice.

sociates' performance of the agreement; and, (c) there is no basis at law or in equity for dismissing the petition or staying it. Therefore, the court will grant the petition to compel Scott Nordheimer, Gary Nordheimer, and Myer Feldman to participate in the pending arbitration between NF Associates and O & Y Landmark of Virginia. The court further denies respondents' motion to dismiss or stay the petition.